Present:  Carrico, C.J., Compton,[1] Lacy, Hassell, Keenan, Koontz, and Kinser, JJ.

CARL LEE WILLIAMS
                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 990774            March 3, 2000

COMMONWEALTH OF VIRGINIA

            FROM THE COURT OF APPEALS OF VIRGINIA

    In this appeal, we consider whether police officers violated a defendant's Fourth Amendment rights to be free from unreasonable searches and seizures and whether the evidence was sufficient to support the defendant's convictions for murder, robbery, and statutory burglary.

                              I.

    A grand jury in the City of Richmond indicted Carl Lee Williams for the following offenses:  murder in violation of Code § 18.2-32, robbery in violation of Code § 18.2-58, and statutory burglary in violation of Code § 18.2-91.  Williams was tried at a bench trial in the Circuit Court for the City of Richmond and found guilty of the charged offenses.  The circuit court fixed his punishment as follows:  life imprisonment for the murder conviction, life imprisonment for the robbery conviction, and 20 years imprisonment for the statutory burglary conviction.  Williams appealed the circuit

_____

    [1] Justice Compton participated in the hearing and decision of this case prior to the effective date of his retirement on February 2, 2000.

court's judgment to the Court of Appeals, claiming that the circuit court erred in denying his motion to suppress evidence obtained from a warrantless search and seizure of his boots that were in the possession of the Sheriff of the City of Richmond.  Williams also argued that the evidence was insufficient to support his convictions.  The Court of Appeals affirmed the judgment of the circuit court, Williams v. Commonwealth, 29 Va. App. 297, 512 S.E.2d 133 (1999), and Williams appeals.

## II.

On Sunday morning, November 3, 1996, the victim, Leslie Anne Coughenour, left her home in Henrico County and went to a law office, where she was employed, at 416 West Franklin Street in the City of Richmond.  Coughenour had informed her roommate, Andrea Melillo, that Coughenour would return to their home on Sunday evening.  When Melillo arrived at their home about 8:00 p.m. that evening, she was concerned because Coughenour was not there.  Melillo made a telephone call to Coughenour's office, but no one answered the telephone.

Around 10:30 p.m., Melillo went to Coughenour's office, but she was unable to enter the building.  Melillo observed Coughenour's car parked in front of the building.  Melillo placed a note on the car, returned to her home, and waited for Coughenour to arrive.

2

Sometime after midnight, Melillo placed a telephone call to the Richmond Police Department, and it dispatched a police officer who met her at Coughenour's office around 1:00 a.m. The police officer checked the exterior of the building and found nothing unusual.

Melillo returned to her home, and she made a telephone call to a friend, who contacted Coughenour's employer, Carolyn Carpenter. Carpenter met Richmond police officer Charles A. Bishop and another officer at the building about 3:25 a.m. Monday morning, November 4, 1996. When they entered the building, they learned that the office alarm system was not activated. However, an inner set of doors, which should have been locked, was unlocked. The doors to a cabinet were open, and certain items had been removed.

The officers walked up a stairway to the second floor of the building. Officer Bishop opened the door to a storage room, examined the room using his flashlight, and found Coughenour's body situated in a swivel chair, which was tied to a radiator. The body was bound to the chair with two sets of ligatures. The victim's hands were tied to the chair, and her ankles were also bound. The victim's head was covered with a scarf. A plastic bag, which contained a rubber ball, had been placed in the victim's mouth so tightly that the bag filled the entire outer part of the victim's oral cavity. The

3

victim's throat had been slashed.  The victim's right wrist had been cut, and a number of tendons and the radial artery had been severed.  Carpet on the floor below the victim's right hand was soaked with blood.  The victim had contusions and abrasions to her head and had suffered a hemorrhage to her brain caused by the infliction of blows to the side of her head.  She had bruises on her arm.  Dr. Glen R. Groben, a medical examiner, testified that the cause of Coughenour's death was asphyxiation, with bleeding from the wrist as a contributing factor.  He opined that her death would have occurred within three to five minutes after the plastic bag had been forced into her mouth.

Melillo testified that when Coughenour left their home about 11:45 a.m. on November 3, she had about ten dollars in cash.  She was wearing a gold rope chain bracelet, a gold herringbone necklace, and a gold diamond and sapphire ring.  She also wore a diamond earring in her left ear and other assorted earrings in both ears and a "Mickey Mouse" watch.  She had in her possession a laptop computer and a black and gold Central Fidelity bank card which bore her name.  The card could be used to access a joint account that Coughenour and Melillo shared.  The police officers did not find any of these items at the murder scene.

An examination of the crime scene revealed that a window in a men's restroom on the second floor of the building had been broken. The window is adjacent to a fire escape. Broken glass from the window had been placed in a trashcan in the restroom. Occupants of the office building testified that the window had not been in that condition on the Friday before Coughenour's death. Additionally, a hole had been "knocked in" a wall adjoining the room where the victim's body was found. This damage did not exist on the Friday before the victim's body was found. Tenants of the building reported that two laptop computers, a computer printer, a black portable compact disc player which contained a compact disc entitled "Classical Cuts," a Rolodex address and telephone card index, a small pair of Bushnell brand binoculars, a small, folding multi-purpose tool, and $50 in cash were missing.

The police investigators found an imprint of the bottom of a boot on a plywood wall panel near the top of the stairs on the second floor. Forensic detectives removed this piece of plywood from the wall and forwarded it to a forensic laboratory for an analysis.

On Saturday night, November 2, 1996, the evening before Coughenour was last seen alive, Cherry A. Wright had a party at her apartment in the Gilpin Court housing development in

Richmond.  Several persons, including the defendant, attended the party.  According to Wright, everyone was "drinking and doing cocaine."  The defendant became "frustrated" and "angry" because he did not have any cocaine or money to purchase cocaine.  The defendant removed some of his clothing and traded it for $10 or $15 worth of cocaine.  Williams left Wright's apartment at 2:00 a.m., November 3, 1996.

Between 10:30 and 11:00 p.m. on November 3, the defendant returned to Wright's apartment.  When she opened the door, the defendant asked if she was alone.  When she responded yes, he entered her apartment and told her that he had a box he wished to place in her closet.  He also had a "liquor box" and a compact disc player.  Williams asked Wright did she "want to party," he "pulled out some cocaine," "[h]e pulled out a watch," and "he had a ring on his finger."  He also had "a wad of money."  The ring that he was wearing looked like the ring that had been taken from Coughenour.  The defendant gave Wright $25, a small quantity of cocaine, and a "Mickey Mouse" watch which looked like Coughenour's watch.  The portable compact disc player that the defendant had taken to Wright's apartment was similar to the compact disc player that had been taken from the murder scene, and the compact disc player contained a compact disc entitled "Classical Cuts," the identical name of the compact disc that had been taken from

6

the murder scene.  The defendant also had a small pair of Bushnell brand binoculars and a small hand tool that resembled similar items removed from the building where the murder occurred.

On Wednesday, November 6, 1996, the defendant returned to Wright's apartment and told her "he was broke and that he needed some more money . . . to get high."  He directed her to retrieve the box which he had hidden in her closet.  He opened the box, which contained two laptop computers and a computer printer.

Wright's son, William Wright, found a black and gold Central Fidelity bank card in Wright's apartment.  When the defendant saw that Wright's son had the card, the defendant took the card and stated that "I thought I got rid of this." Wright also observed that the defendant had a small card with telephone numbers which resembled the Rolodex address and telephone card that had been taken from the building where the victim worked.

Cynthia Lafawn Tyler, a resident of the Gilpin Court housing development, saw the defendant "a day or two" after November 2, 1996.  The defendant had a compact disc player that she wanted to buy, but the defendant would not sell it to her.  The defendant reached in his pocket, "pulled out his own [cocaine] and his own money.  He flashed it."  Tyler testified

7

that the defendant's actions meant that he had his own money and cocaine and that he did not need her money. The defendant had a "Mickey Mouse" watch and a ring that looked like the victim's ring. The defendant asked Tyler to take him to a 7-Eleven store on Chamberlayne Avenue in Richmond because he wanted to use an ATM machine that did not have a video camera that recorded automated transactions. Someone used Coughenour's ATM card to obtain $300 in cash, from the account the victim shared with Melillo, utilizing ATM machines, including the ATM machine at the 7-Eleven store where Tyler had taken the defendant.

Guy Lee Robinson, another resident of the Gilpin Court housing development, gave the defendant $150 worth of cocaine in return for one of the laptop computers and a printer. Robinson saw the "Mickey Mouse" watch that the defendant had given to Wright. Later, Robinson's sister-in-law acquired the watch. Robinson destroyed the watch and threw the computer and printer in a creek when he learned that the defendant may have taken these items from the building where Coughenour's body was found.

The defendant was arrested for a parole violation and placed in a jail. When he was released from jail, the defendant had a conversation with Wright. Wright informed him that people in the neighborhood had been talking and asking

8

questions; so she asked him whether he had anything to do with the lawyer. The defendant said "that it had to do — [do you] want to know what happened with the lawyer?" Wright said no.

On November 30, 1996, the defendant was incarcerated at the Richmond City Jail on an unrelated charge. When he was processed as a prisoner, he was relieved of his property, including his clothing, a strip search was conducted, and an inventory was taken of his property. The only items that he was allowed to keep were his socks and underwear.

In accordance with the Richmond Sheriff's policies and procedures, each prisoner's property is placed in a separate bag, and the prisoner's initials are affixed to the bag. A prisoner does not have free access to the property. Fifteen officers who work in the jail's quartermaster section have access to any property seized from prisoners. The property is returned to a prisoner when the prisoner is released from custody. Lieutenant Clarence L. Jefferson, a deputy sheriff, testified that prisoners' shoes are taken from them and prisoners are issued "jail shoes" because hard-sole shoes or street shoes have hard heels which are dangerous to officers and inmates.

Richmond police detective James Hickman received a "tip" that Williams' boot matched the boot impression that was found at the scene of the crimes. The Richmond Sheriff's deputies

received a request to examine the defendant's boots from the Richmond police officers. The deputy sheriffs gave the defendant's boots to the police officers without a search warrant.

Robert B. Hallett qualified as an expert witness on the subject of shoe print impressions. He conducted tests on the defendant's boots. Hallett testified that the boot impression on the wall at the murder scene was either made by the defendant's right boot or a boot that was identical in size, shape, tread pattern, and the locations and configurations of two cuts which had been inflicted on the bottom of the defendant's boot by sharp objects. Even though there was a deviation in general wear between the boot that left the impression at the crime scene and the boot that was taken from the defendant, Hallett testified that he had never seen two different boots with such identical characteristics.

Richmond police detective James Hickman testified that when he served the indictments upon the defendant, the defendant stated that he had been in New York from October through the end of December 1996. Richmond police sergeant Gary Keith Ladin, however, testified that he saw the defendant in Richmond on November 29, 1996.

Keitha Lasha Thomas, the defendant's girlfriend, testified that while she was incarcerated at a correctional

facility in Goochland County, the defendant sent a letter to her describing his crimes. The defendant stated, in the letter, that he entered the building where the victim worked when it was "dark outside" and that the victim arrived when "it had got[ten] light." The defendant told Thomas that he had taken some computers, the victim's ring, and a bank card because she did not have much money. The defendant stated that "he tried to smother the bitch but the bitch wouldn't die fast enough." He stated that "he cut her throat. Then he went on to say he cut her wrists."

The defendant testified that he did not commit the crimes, but admitted possession of some of the stolen property. He claimed that he obtained the stolen property and the boots from a man whom he identified as Mark Cromartie. The defendant denied that he told Detective Hickman that he had been in New York from October through December and insisted that he had said he had been in New York until the end of November instead. The defendant also admitted that he acquired money to purchase drugs by committing "B&E[s]."

### III.

The defendant filed a motion to suppress the evidence related to the examination of his boot. He argued that the Richmond police officers violated his rights guaranteed by the Fourth Amendment when the officers obtained his boots from the

11

Richmond Sheriff and conducted tests on the boots.  The circuit court denied the defendant's motion, and the Court of Appeals agreed with the circuit court's ruling.  The defendant makes the same argument on appeal.  We disagree with the defendant.

Initially, we observe that the Fourth Amendment protects the privacy interests of persons.  Katz v. United States, 389 U.S. 347, 350-51 (1967).  In Oliver v. United States, 466 U.S. 170, 177 (1984), the Supreme Court stated that:  "[s]ince Katz . . . the touchstone of [Fourth] Amendment analysis has been the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'  Id., at 360 (Harlan, J., concurring).  The Amendment does not protect the merely subjective expectation of privacy, but only those 'expectation[s] that society is prepared to recognize as "reasonable."'  Id., at 361."

In United States v. Edwards, 415 U.S. 800 (1974), the Supreme Court considered whether the Fourth Amendment required that police officers obtain a search warrant before searching an arrestee's clothing.  Edwards was lawfully arrested and charged with attempting to break into a post office.  He was taken to a local jail.  An investigation revealed that the perpetrator of the crime for which Edwards was charged had attempted to gain entry into the post office through a wooden

12

window which had been pried with a pry bar, thereby causing paint chips to fall on a window sill and a wire mesh screen. Edwards, 415 U.S. at 801-02.

Edwards spent the night in the jail.  The next morning, jail officials seized the clothing that he had been wearing at the time of and since his arrest and held the clothing as evidence.  Examination of the clothing revealed paint chips that matched the samples taken from the post office window. Edwards' clothing and evidence of the paint chips were admitted in evidence at trial over Edwards' objection.  Id. at 802.

The Supreme Court, approving the admission of the evidence without a search warrant, held:

> "With or without probable cause, the authorities were entitled at that point [in the booking process] not only to search Edwards' clothing but also to take it from him and keep it in official custody. There was testimony that this was the standard practice in this city.  The police were also entitled to take from Edwards any evidence of the crime in his immediate possession, including his clothing."

Id. at 804-05.  Moreover, the Supreme Court observed:

> "Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest."

Id. at 806.  Concluding, the Supreme Court stated in Edwards:

13

> "'While the legal arrest of a person should not destroy the privacy of his premises, it does — for at least a reasonable time and to a reasonable extent — take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.'"

Id. at 808-09 (quoting United States v. DeLeo, 422 F.2d 487, 493 (1970)).

We conclude that the defendant, Williams, had no expectation of privacy in his boots that society is prepared to recognize as reasonable. The boots were in the custody of the Richmond City Sheriff pursuant to administrative booking policies and procedures. We hold that when a person, such as the defendant, has been lawfully arrested and his property has been lawfully seized by law enforcement personnel pursuant to that arrest, the arrestee has no reasonable expectation of privacy in that property, and later examination of the property by another law enforcement official does not violate the Fourth Amendment.[2] See United States v. Turner, 28 F.3d 981, 983 (9th Cir. 1994), cert. denied, 513 U.S. 1158 (1995) (postal service inspector's removal of a cap without a warrant from defendant's property bag at a jail does not violate the

_____

[2] We find no merit in Williams' argument that Edwards is not controlling because the clothing examined in Edwards related to the charge for which Edwards had been arrested. This distinction is legally insignificant because the dispositive inquiry remains whether the defendant, Williams, had an expectation of privacy in the seized items. The defendant had no such expectation.

14

defendant's Fourth Amendment rights because initial search and seizure of defendant's personal items was lawful); United States v. Thompson, 837 F.2d 673, 676 (5th Cir. 1988), cert. denied, 488 U.S. 832 (1988) (subsequent inspection of keys by a federal agent did not unduly intrude upon defendant's expectation of privacy when police lawfully viewed the keys earlier at the time of inventory); United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir. 1987); United States v. Burnette, 698 F.2d 1038, 1049 (9th Cir. 1983), cert. denied 461 U.S. 936 (1983) ("once an item in an individual's possession has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant"); United States v. Phillips, 607 F.2d 808, 809-10 (8th Cir. 1979); United States v. Oaxaca, 569 F.2d 518, 524 (9th Cir. 1978), cert. denied, 439 U.S. 926 (1978) (seizure of defendant's shoes six weeks after his arrest while defendant was still in custody at the county jail did not violate defendant's Fourth Amendment rights); United States v. Jenkins, 496 F.2d 57, 73 (2nd Cir. 1974), cert. denied, 420 U.S. 925 (1975) (federal agent can view money to compare serial numbers when police seized the money after arresting defendant on unrelated state charges and kept money in an envelope in a jail safe for safekeeping apart from defendant's

15

other belongings); State v. Copridge, 918 P.2d 1247, 1251 (Kan. 1996); State v. Wheeler, 519 A.2d 289, 292 (N.H. 1986); Contreras v. State, 838 S.W.2d 594, 597 (Tex. App. 1992).

IV.

Williams argues that the evidence is insufficient to support his convictions. We disagree.

Applying well-established principles of appellate review, we must consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below. Phan v. Commonwealth, 258 Va. 506, 508, 521 S.E.2d 282, 282 (1999); Derr v. Commonwealth 242 Va. 413, 424, 410 S.E.2d 662, 668 (1991). The burden is upon the Commonwealth, however, to prove beyond a reasonable doubt that the defendant was the perpetrator of these crimes. Phan, 258 Va. at 511, 521 S.E.2d at 284. Additionally, circumstantial evidence is as competent, and entitled to the same weight, as direct testimony, if that circumstantial evidence is sufficiently convincing. Epperly v. Commonwealth, 224 Va. 214, 228, 294 S.E.2d 882, 890 (1982); Stamper v. Commonwealth, 220 Va. 260, 272, 257 S.E.2d 808, 817 (1979), cert. denied, 445 U.S. 972 (1980).

The evidence, which is summarized in Part II of this opinion, and which we need not repeat here, was sufficient to

16

permit the circuit court to find beyond a reasonable doubt that the defendant was the perpetrator of these crimes. Moreover, as we have already stated, the defendant admitted to Thomas that he killed Coughenour and he asked Wright if she wanted to know how the murder occurred. The defendant admitted that he often committed "B&E[s]" when he needed money to purchase cocaine. The defendant possessed property taken from the scene of the murder soon after the crimes occurred.

V.

We find no merit in the defendant's remaining arguments. For the reasons stated, we will affirm the judgment of the Court of Appeals.

Affirmed.