# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 25, 2014 Session

## STATE OF TENNESSEE v. HAROLD MORRIS

**Appeal from the Criminal Court for Morgan County**
**No. 9338     E. Eugene Eblen, Judge**

---

**No. E2013-00803-CCA-MR3-CD - Filed May 6, 2014**

---

Following a jury trial, the Defendant, Harold Morris, was convicted of aggravated rape, a Class A felony; aggravated robbery, a Class B felony; and aggravated burglary, a Class C felony. See Tenn. Code Ann. §§ 39-13-402, -13-502, -14-403. The trial court imposed an effective sentence of twenty-five years to be served at one hundred percent. On appeal, the Defendant contends (1) that the trial court erred in denying his motion to suppress evidence and (2) that the trial court erred in denying his motion to dismiss on the grounds that his right to a speedy trial had been violated. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JEFFREY S. BIVINS, JJ., joined.

Kent Lowery Booher, Harriman, Tennessee (at trial); and Robert L. Vogel, Knoxville, Tennessee (on appeal), for the appellant, Harold Morris.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Russell Johnson, District Attorney General; and Frank A. Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

The victim, O.W.,[1] testified that on April 08, 2007, she was eighty-nine years old, a widow, and lived alone in a rural area of Morgan County. That evening, a man O.W. did not know knocked on her door and said that he wanted to "know about the family that lived up above" her, "whether they were home or not." The man then "just came in" the victim's house without her permission, "sat down in the chair by the door[,] and just went to talking to [her] about that family." When he finished talking, the man "got up and locked the front door and pulled [her] phone out of the wall."

O.W. testified that the man grabbed her by her feet, dragged her "out of [her] chair," and started "to pull [her] clothes off." The man then penetrated her vagina. The victim testified that she tried to fight the man off but that she was scared and that he was stronger than she. She also testified that her breasts were injured during the rape from where the man had been "chewing on them." After he finished raping her, the man took the victim's wedding rings, a bracelet, and a watch. O.W. testified that in taking the jewelry, the man "tore [her] finger up." O.W. later learned that she also suffered a cracked rib during the attack.

The man left once he had the victim's jewelry. The victim testified that the man was wearing "blue jeans and a blue jean jacket" and that he drove away in a gray van with "windows all the way around" it. O.W. then called her neighbor, Glen Moore, to tell him what happened. The police were called, and O.W. was eventually taken to a nearby hospital. O.W. testified that, at first, she did not tell anyone that she had been raped because she was "embarrassed to talk about it" but claimed that she eventually told her neighbor and the staff at the hospital. However, there was no rape kit performed at the hospital. O.W. later picked the Defendant's picture out of a photographic lineup and identified him at trial as her attacker.

Mr. Moore testified that he received a phone call from the victim around 4:00 p.m. and that she told him "something terrible [had] happened." When he got to the victim's house, Mr. Moore found her sitting in a chair with blood "dripping off of her finger." Mr. Moore testified that it looked like something had "skinned" her finger and left arm. Mr. Moore's wife tended to the victim's injuries while he left to search for the van. The victim's son testified that she was in "pretty bad shape mentally" when he got to her house. He testified that the victim did not say anything while they were at her house about being raped, that she told the hospital staff that the attacker had attempted to rape her, and that she did not actually say she was raped until the preliminary hearing.

---

[1]It is the policy of this court to refer to victims of rape by their initials.

Chief Allan Dagley of the Sunbright Police Department testified that in 2007 he worked for the Morgan County Sheriff's Office (MCSO) and was the first officer to respond to the victim's home. Chief Dagley recalled that the victim had a "little bit of blood" on her hand, "was real nervous," and pacing. Chief Dagley testified that the victim did not say anything about being raped while he was at her house but that later, "once she got a little more comfortable with actually what had just happened," she stated that the attacker had "taken her clothes off and gotten on top of her and assaulted her."

Investigator Mike Wren of the MCSO testified that he led the investigation in this case. Investigator Wren testified that he was given an anonymous tip that he "might want to check in the Cumberland County jail." Officer Tony Aikens of the Crossville Police Department testified that on the evening of April 8, 2007, he spotted the Defendant driving a light blue van that had "[w]indows all around." The van's headlights were off, and its tag was expired. Officer Aikens turned on his blue lights, and the Defendant fled for over two miles. The van was eventually stopped by a "spike strip."

The Defendant was wearing blue jeans and "a jean jacket" when he was taken out of the van. The Defendant had "a strong odor of alcohol coming from his breath," had blood shot eyes, and "very slurred speech." The Defendant stated to Officer Aikens, "[T]his is retarded, I've drank too much." Officer Aikens arrested the Defendant for driving under the influence (DUI) as well as felony evading arrest and took him to the Cumberland County jail.

Corrections Officer Terry Boots of the Cumberland County Sheriff's Department (CCSD) testified that it was department procedure to search and inventory the personal property of every person booked into the Cumberland County jail. Officer Boots testified that he searched the Defendant and found a watch, a bracelet, and two rings in a pocket of the Defendant's jeans. The items were then inventoried and placed in to a property bag that was locked in the jail's property room. Officer Boots testified that the items were the Defendant's personal property and not seized as evidence.

Acting on the anonymous tip, Investigator Wren contacted Investigator Scott Griffin of the CCSD and arranged to view the jewelry found when the Defendant was arrested. Investigator Wren testified that "[b]ased on what [he] had seen on [the] inventory sheet, it matched up with the description of the things that [the victim] had [taken], so [they] did look in the bag and [he took] some photographs." Investigator Griffin testified that he took possession of the jewelry that day, April 16, 2007, to keep as possible evidence. However, Investigator Wren recalled viewing the property on April 9 or 10, 2007. Investigator Wren testified that he showed the photographs of the items to the victim and that she identified them as the jewelry taken by her attacker. The victim was sure that the jewelry was hers because it had been given to her by her deceased husband.

Investigator Wren testified that he showed the victim a photographic lineup on April 10, 2007, and that she identified the Defendant as her attacker. Investigator Wren looked at the Defendant's van at the impound lot and testified that it "matche[d] almost perfectly" the victim's description. Investigator Wren also noticed that the van was damaged and had mud on it. Investigator Wren testified that he believed the Defendant fled the victim's home on an old "oil well road" behind the victim's home and that was where the mud and damage to the Defendant's van had come from. Officer Wren testified that he took custody of the Defendant and the jewelry from the CCSD on May 14, 2007.

Based upon the foregoing evidence, the jury convicted the Defendant of aggravated rape, aggravated robbery, and aggravated burglary. The trial court sentenced the Defendant as a Range I, standard offender to eight years for the aggravated robbery conviction and five years for the aggravated burglary convection. The trial court sentenced the Defendant to twenty-five years to be served at one hundred percent for the aggravated rape conviction. The trial court ordered the sentences to be served concurrently for an effective twenty-five year sentence. This appeal followed.

## ANALYSIS

### I. Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress the jewelry found in his pants when he was arrested in Cumberland County. The Defendant argues that since the jewelry was taken from his "person and placed in a secured location for his later retrieval . . ., there was a reasonable expectation of privacy for which a warrant was required." The State responds that since the items were seized during a valid inventory search at the Cumberland County jail, Investigator Wren did not need a warrant to examine and photograph the jewelry.

### A. Standard of Review

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court." State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. However, "when the trial court does not set forth its

findings of fact upon the record of the proceedings, the appellate court must decide where the preponderance of the evidence lies." State v. Bobby Killion, No. E2008-01350-CCA-R3-CD, 2009 WL 1748959, at *13 (Tenn. Crim. App. June 22, 2009), perm. app. denied, (Tenn. Oct. 26, 2009) (citing Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001)). Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722. Here, the trial court simply overruled the Defendant's motion without making any findings of fact or conclusions of law.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). Such exceptions to the warrant requirement include "searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search." Talley, 307 S.W.3d at 729. These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)) (internal quotation marks omitted). Therefore, "a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure." Killion, 2009 WL 174859, at *14.

*B. Validity of Search at Cumberland County Jail*

The warrantless search of the Defendant's person by Officer Boots was justified under two exceptions to the warrant requirement. The first justification was a search incident to arrest because it has been routinely held "that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." State v. McDougie, 681 S.W.2d 578, 584 (Tenn. Crim. App. 1984) (quoting United States v. Edwards, 415 U.S. 800, 803 (1974)). The second justification was based upon the fact that law enforcement authority in cases of incarceration "extends to performing a detailed 'inventory search' of all personal effects in the arrestee's possession." State v. Crutcher, 989 S.W.2d 295, 301 (Tenn. 1999) (citing Illinois v. Lafayette, 462 U.S.

640, 648 (1983)).  Therefore, Officer Boots's warrantless search of the Defendant and seizure of the jewelry were valid.

*C. "Second Look"*

Given that Officer Boots's search of the Defendant and seizure of the jewelry were valid, the operative question for our analysis is whether Investigator Wren needed a warrant to examine the jewelry after it had been placed in the Cumberland County jail's property room.  For almost half a century, the United States Supreme Court has declared that reasonableness is the "touchstone of the Fourth Amendment."  Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Katz, 389 U.S. at 360).  In order to evaluate whether a reasonable expectation of privacy exists, under both our state and federal constitutions, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances."  State v. Munn, 56 S.W.3d 486, 494 (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)).  "A subjective expectation of privacy that society does not regard as reasonable will not invoke Fourth Amendment protection."  State v. Brandon Ray Roland, No. E2002-00927-CCA-R3-CD, 2003 WL 21983024, at *14 (Tenn. Crim. App. Aug. 21, 2003), perm. app. denied, (Tenn. Dec. 22, 2003).

The question of whether a warrant is needed before a police officer can take a "second look" at items previously seized during an inventory search is one of first impression in this state.  However, the consensus among jurisdictions that have addressed this issue appears to be that once a person has "been lawfully arrested and his property has been lawfully seized by law enforcement personnel pursuant to that arrest, the arrestee has no reasonable expectation of privacy in that property, and later examination of the property by another law enforcement official does not violate the Fourth Amendment."  Williams v. Commonwealth, 527 S.E.2d 131, 136 (Va. 2000) (citing cases from various jurisdictions).  This is because no "situation imaginable is as alien to the notion of privacy than an arrestee sitting in a jail cell, completely separated from his effects that are lawfully controlled and inventoried by the very police that are investigating him."  Oles v. State, 993 S.W.32d 103, 109 (Tex. Crim. App. 1999).  Put another way, an "arrestee has no reasonable expectation that the police will not scrutinize closely those items that are in their legitimate custody, discovering evidence, perhaps, even where none was initially suspected."  Wallace v. State, 816 A.2d 883, 894 (Md. 2003) (quoting Holland v. State, 713 A.2d 364, 368 (Md. Ct. Spec. App. 1998)).

The fact that the items were evidence of a separate crime from the DUI the Defendant was initially arrested for does not alter this analysis because the test to determine reasonableness examines an individual's subjective expectation of privacy and not a police "officer's investigatory motive."  Wallace, 816 A.2d at 898.  Here, Investigator Wren

received an anonymous tip that he "might want to check in the Cumberland County jail." Investigator Wren reviewed the inventory sheet for the Defendant's property and saw that the jewelry listed matched the description of the items taken from the victim. He then examined the jewelry and took photographs of it. After that, Investigator Wren went to look at the Defendant's van and saw that it matched the victim's description. He then showed the pictures of the jewelry to the victim. The victim identified the jewelry as belonging to her and picked the Defendant's picture out of a photographic lineup, after which Investigator Wren arrested the Defendant and seized the jewelry. Based upon the foregoing, we cannot conclude that Investigator Wren's actions violated any actual, subjective expectation of privacy held by the Defendant. Accordingly, we affirm the trial court's denial of the Defendant's suppression motion.

*II. Right to Speedy Trial*

The Defendant contends that the trial court erred in denying his motion to dismiss on the grounds that his right to a speedy trial had been violated. The Defendant argues that the over two-year delay between his indictment and his trial violated his right to a speedy trial and prejudiced his defense. According to the Defendant, the jewelry that was found when he was arrested belonged to his mother, but she died prior to trial, leaving him with no way to establish his defense. The State responds that the trial court did not abuse its discretion in denying the Defendant's motion and that the Defendant failed to show he was prejudiced by the delay.

The Defendant was originally indicted on May 21, 2007. On March 10, 2009, the Defendant filed a pro se motion to dismiss his appointed counsel because counsel had "been ineffective and [] prolonged the process of . . . his case." The same day, the Defendant filed a pro se motion invoking his right to a speedy trial but made no claim that he had been prejudiced by the delay. The trial court granted the Defendant's motion to remove his appointed counsel and appointed a new attorney to represent him at trial.

A few days before the trial, the Defendant filed a pro se motion to dismiss his case based upon the violation of his right to a speedy trial. Again, the Defendant made no claim that he had been prejudiced by the delay. At a hearing immediately before the start of the trial, defense counsel made the following argument regarding prejudice:

> There are – there are some interesting issues on who in fact is the owner
> of the jewelry that was taken from him as part of the suppression issue
> obviously. It is our position that it was his personal property and belonged
> where it was until he was out.

But clearly our problem that we have is the prejudice from just the two year delay in getting to trial had meant that he's not had the opportunity to work and get defenses in line. Testimony of witnesses who could come in and say "oh yeah, the watch that belonged to his mother" and that sort of thing.

During the hearing, defense counsel did not elaborate on who the possible witnesses were or why they were unavailable to testify at trial.

In response, the State noted that the case had originally been set for a plea agreement but that the Defendant decided to reject the agreement when "the time for [it to be entered] came." The trial court denied the Defendant's motion to dismiss stating that there was "not any particular prejudice shown by the timing in this particular case." The Defendant was tried on June 25, 2009. At the motion for new trial hearing, the Defendant first raised the argument that "during the course of the delay his mother passed so she wasn't available to be called to" testify that the jewelry belonged to her.

*A. Standard of Review*

Once the State initiates criminal proceedings, the right to a speedy trial is implicated pursuant to the Sixth Amendment to the United States Constitution and to article 1, section 9 of the Tennessee Constitution. See Tenn. Code Ann. § 40-14-101 (2006); Tenn. R. Crim. P. 48(b). The right is meant to protect the defendant "against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). In Barker v. Wingo, 407 U.S. 514, 530 (1972), the Supreme Court devised a balancing test to determine speedy trial issues and identified the following factors for consideration: (a) the length of delay; (b) the reason for the delay; (c) the defendant's assertion of his right to a speedy trial; and (d) the prejudice to the defendant. See also State v. Bishop, 493 S.W.2d 81, 84-85 (Tenn. 1973) (implicitly adopting the Barker balancing test for our State's constitutional and statutory right to a speedy trial). The balancing test adopted in Barker "necessarily compels courts to approach speedy trial cases on an ad hoc basis." Barker, 407 U.S. at 530. The remedy for the denial of a speedy trial is dismissal of the charges. Strunk v. United States, 412 U.S. 434, 439 (1973).

The first Barker factor, length of delay, is a threshold factor, serving as the triggering mechanism "that will necessitate the consideration of the other three factors." State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996). Until the accused establishes a period of delay that is "presumptively prejudicial," there will be "no necessity for inquiry into the other factors that go into the balance." Barker, 407 U.S. at 530; see also State v. Easterly, 77 S.W.3d 226, 235-36 (Tenn. Crim. App. 2001). Generally, "a delay must approach one year to trigger the

Barker v. Wingo analysis," although "the line of demarcation depends on the nature of the case." State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997); see Doggett v. United States, 505 U.S. 647, 652 n.1 (1992). The delay of over two years between the Defendant's inital indictment and his trial is enough to require inquiry into all of the Barker factors. We review a trial court's determination regarding a claim of a violation of the defendant's right to a speedy trial for abuse of discretion. Easterly, 77 S.W.3d at 236.

*B. Length of Delay*

The reasonableness of the length of the delay depends "upon the peculiar circumstances of each case." Easterly, 77 S.W.3d at 235. The delay "that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." Id. (citing Barker, 407 U.S. at 530-31). However, "the presumption that [the] delay has prejudiced the accused intensifies over time." State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001). While the over two-year delay between the Defendant's initial indictment and his trial is sufficient to trigger the full Barker analysis, "this period of delay is not necessarily unreasonable when compared to other cases." Id. (delay of twenty-three months); see also Doggett, 505 U.S. at 653 (delay of six years); Wood, 924 S.W.2d at 346 (delay of thirteen years); Easterly, 77 S.W.3d at 236 (delay of twenty months). Additionally, "the delay is not egregious, given the fact" that the Defendant is charged with three felonies ranging from Class C to Class A. Easterly, 77 S.W.3d at 236 (delay of twenty months not egregious given the fact the defendant was charged with a Class A felony). Therefore, this factor weighs in favor of the State.

*C. Reason for Delay*

The next Barker factor to be considered, reason for the delay, generally falls into one of the following categories: "(1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense." Wood, 924 S.W.2d at 346-47. Intentional delay is "weighted heavily" against the State while "negligence or oversight are considered against the [State] but afforded comparatively more neutral weight." Easterly, 77 S.W.3d at 236 (citing Barker, 407 U.S. at 531).

There is nothing in the record to suggest that the delay in this case was intentionally caused by the State. Instead, the delay appears to have been caused, in part, by the Defendant's decision to reject a plea agreement when "the time for [it to be entered] came." See Wood, 924 S.W.2d at 347 n.12 (stating that "[g]ood faith attempts to plea-bargain" are an example of delays caused, or acquiesced in, by the defendant). Additionally, delay was

caused by defense counsel requesting and receiving a psychiatric evaluation of the Defendant. See State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993) (holding that part of the delay was "attributable . . . to the defendant's request for [a] psychological evaluation"). Further delay was caused by the Defendant's motion to remove his appointed counsel in March 2009. These types of delays, which are caused or acquiesced in by the defendant, are weighed against the defendant in the Barker analysis. Therefore, this factor weighs in favor of the State.

## *D. Assertion of Right*

The third factor in the Barker analysis is "the defendant's assertion or failure to assert the right to a speedy trial." Simmons, 54 S.W.3d at 760. A defendant's assertion of the right "is entitled to strong evidentiary weight in determining whether the right has been denied, and failure to assert the right will make it difficult to prove it was denied." Wood, 924 S.W.2d at 348. The defendant's failure to assert the right "implies [the] defendant does not actively seek a swift trial." Id. Here, the Defendant, while waiting until March 2009 to do so, did assert his right to a speedy trial in a pro se motion filed along with his motion to dismiss appointed counsel. Accordingly, this factor weighs in favor of the Defendant.

## *E. Prejudice*

The final Barker factor is whether the accused suffered any prejudice as a result of the delay. Simmons, 54 S.W.3d at 760. This factor is the most important factor in the analysis and seeks to protect the following specific interests of the defendant: "(1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety and concern; and (3) limiting the possibility of impairment to preparation of the defense." Easterly, 77 S.W.3d at 237. The weight of the first three factors in favor or against the defendant determines whether prejudice is presumed or if the defendant bares the "burden to show actual prejudice." United States v. Bergfeld, 280 F.3d 486, 488 (5th Cir. 2002) (citing Doggett v. United States, 505 U.S. 647, 656-57 (1992)). Here, two of the first three factors weighed against the Defendant; therefore, he had the burden "to put forth specific evidence of prejudice." Id. at 490.

Generally, "[i]f witnesses die or disappear during a delay, the prejudice is obvious." Barker, 407 U.S. at 532. However, "some substantiation is required" even for this type of prejudice. 5 Wayne R. LaFave et al., Crim. Proc. § 18.2(e) (3d ed.). At a minimum, a defendant must show "that the witness truly is now unavailable, that he would have been available for a timely trial, and that his testimony would have been of help to the defendant." Id. (citing cases). A blanket statement that "gives no indication as to the content and

relevance of the lost testimony" is not sufficient to establish prejudice. United States v. Harris, 566 F.3d 422, 433 (5th Cir. 2009).

The Defendant has made no claims that his pretrial incarceration was oppressive or that the delay caused him anxiety and concern. Rather, the Defendant's sole claim of prejudice was that the preparation of his defense was impaired by the delay. Specifically, the Defendant claims on appeal that his mother would have testified that the jewelry belonged to her, but she died prior to trial. However, the only showing the Defendant made on this claim prior to the trial court's ruling was a blanket statement that the delay precluded the "[t]estimony of witnesses who could come in and say 'oh yeah, the watch that belonged to his mother,' and that sort of thing." This blanket statement was not sufficient for the trial court to find prejudice.

Furthermore, the only information regarding the Defendant's mother was trial counsel's statement during the motion for new trial hearing that she died sometime during the delay. The Defendant presented no evidence, such as a death certificate, to substantiate this claim and establish the date of her death. Such evidence is essential to any court's determination of whether the Defendant was prejudiced by the delay. Nor, was there any evidence that the Defendant was unable to preserve his mother's testimony. As such, the Defendant has failed to establish that he was prejudiced by the delay.

### F. Balance of Factors

The delay of over two years between the Defendant's indictment and his trial was lengthy enough to trigger a Barker inquiry, but it was not unreasonable in view of the complexity of the case and the number of felony charges faced by the Defendant. The record reflects that the majority of the delay was caused, or acquiesced in, by the Defendant. The Defendant did assert his right to a speedy trial but waited until almost two years had elapsed before he did so. Given that the first three factors balance against the Defendant, he had the burden of establishing that he was prejudiced by the delay, which he failed to establish. Accordingly, we hold that the trial court did not abuse its discretion in denying the Defendant's motion to dismiss for lack of a speedy trial.

### CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-11-