PRESENT: All the Justices

ABDUL COLE

v. Record No. 161113

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE S. BERNARD GOODWYN
November 16, 2017

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether the Court of Appeals of Virginia erred by reversing a

circuit court's decision to grant a motion to suppress evidence recovered during a strip search.[1]

We also consider whether the Court of Appeals erred by affirming a conviction for possession of

cocaine with the intent to distribute.

BACKGROUND

On April 8, 2014, Officer Tony Moore (Officer Moore) of the Alexandria Police

Department arrested Abdul Rahman Cole (Cole) for an outstanding warrant from Arlington, and

also charged him "for an open container . . . and possession of marijuana" based on items found

during an inventory search of Cole's car following Cole's arrest.[2]  Officer Moore then took Cole

to the Alexandria Detention Center (Jail).  Officer Moore informed the booking deputy, Deputy

---

[1] At the outset, we note that the term "strip search" may refer to a range of actions, including an "instruction to remove clothing while an officer observes from a distance of, say, five feet or more; . . . a visual inspection from a closer, more uncomfortable distance; . . . directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position." *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 325 (2012).  The term is used herein to refer to this range of activities, with the distinction that it does not "include any touching of unclothed areas by the inspecting officer." *Id*.

[2] Cole also moved to suppress the items found during the inventory search of his car after it was impounded.  The circuit court denied that motion, and Cole does not challenge that ruling on appeal.

Robert Roland (Deputy Roland), about the Arlington warrant and the new charges for the open container and marijuana. "[U]pon hearing the drug charge," Deputy Roland said that a strip search was needed, and conducted an initial search in the sally port area before taking Cole to the strip search area of the Jail.

Officer Moore, Deputy Roland, and Cole were in the strip search area behind a closed door, when Cole complied with the instruction to remove his clothing. However, Cole did not comply with the instruction to "turn around and squat," and Officer Moore then "noticed a white plastic baggy hanging out of his anus," and told Cole to put his hands up. After a brief struggle, during which Cole "took[] [the bag] out of his anus and put it in his mouth," Officer Moore recovered the bag from Cole. The bag contained a substance which, after testing, was determined to be cocaine. Based on evidence recovered during that strip search, Cole was indicted in the Circuit Court of the City of Alexandria for possession with the intent to distribute cocaine in violation of Code § 18.2-248.[3]

### MOTION TO SUPPRESS

Prior to trial, the Commonwealth provided Cole a copy of a Certificate of Analysis from the Department of Forensic Science (Certificate). The Certificate listed the bag removed from Cole's anus as "one plastic bag containing fourteen plastic bag corners containing off-white solid material." The contents of five of the 14 bag corners were analyzed separately, and each contained cocaine. Together the bags contained 5.1606 grams of cocaine. The remaining nine bag corners were not tested, and they had a gross weight (including packaging) of 5.2905 grams.

---

[3] Cole was also charged with possession with intent to distribute marijuana, which the circuit court later *nolle prossed*, and with obstruction of justice for impeding law enforcement officers during the strip search. He was convicted of misdemeanor obstruction of justice, and does not challenge that conviction on appeal.

Cole filed a motion to suppress the evidence described in the Certificate. He argued that the evidence from the strip search should be suppressed, because: "[o]fficers may not conduct a strip search of arrestees charged with minor, non-jailable offenses without a showing of 'reasonable suspicion' that they possess or are secreting drugs or weapons;" Cole had not yet been before a magistrate; the Arlington warrant provided no basis to suspect him of hiding contraband; and the only basis for the strip search was the marijuana charge that was based on an allegedly illegal search of his car.

The Commonwealth responded that the strip search of Cole was reasonable and permissible under the Fourth Amendment, and that the search was justified, because he "was going to be entering the jail population" due to the Arlington warrant and because "he had been found to possess drugs at the time of his arrest."

The circuit court held a hearing on the motion to suppress on August 28, 2014. Officer Moore testified that he charged and arrested Cole as described above. He stated that he also found $600 in Cole's pocket, and found Cole's cell phone, an open container of alcohol, and a small cigar that contained marijuana in Cole's car.

Deputy Roland testified that a strip search is performed at the Jail for "[a]nyone that comes in on a drug charge, a weapons charge, or any violent-type crime," and that his supervisor authorized the strip search based on Cole's charges alone. He explained that the booking area of the Jail is for people held for "two to three days," and that whether a person brought in on a warrant from another jurisdiction was detained in the booking area or was processed into the Jail depended on "how long until the jurisdiction's going to come get them." He explained that, "[m]ost of the time," an individual detained in the booking area is not detained in a room by

3

himself or herself. He acknowledged that it was possible that Cole might have been released without entering the general population of the Jail.

On September 5, 2014, the Commonwealth filed a supplemental memorandum requesting to present additional evidence about the Jail's booking area operation and policies. It argued that the Jail's strip search policy was reasonable under *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012), which upheld jail policies requiring a strip search of incoming inmates to prevent the spread of illness and contraband, "regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor or criminal history."[4] Cole filed objections seeking to distinguish *Florence* on the ground that it only addressed inmates entering a jail's general population, and that, even under *Florence*, the strip search was unreasonable, in light of the fact that he was arrested on minor, nonviolent offenses and it had not been determined that he would enter the general Jail population.

The court resumed the hearing on the motion to suppress on September 11, 2014, and allowed the parties to present additional evidence. Lieutenant Joseph Penkey of the Alexandria Sheriff's Office (Lieutenant Penkey) testified about the layout and procedures of the Jail. The upper three floors of the Jail contain the general population inmates, the mental health unit, and disciplinary segregation. The first floor is "very mixed use," and includes the booking area, the sergeant's office, "some specialized housing units" for general population inmates separated by secure doors, a living unit for the workers, the control center, and the visitor center. Four deputies are normally assigned to the booking area. He stated that in the booking area, "the normal number of people you'd be faced with like coming on shift might be 25 in the cells or waiting to be processed either in or out."

---

[4] *Florence* broadly defined "jail" "to include prisons and other detention facilities." 566 U.S. at 322.

Regarding the physical layout of the booking area, there are 12 individual cells, three "fairly large" cells where "three people could fit in easily," and "four fairly large cells where a group of people can be." The cells have toilets, and there is a cell with a shower and toilet next to the booking counter, and another room down the hall with two showers and bathroom supplies, which is where the strip searches occur. There is a waiting area of 18-20 plastic chairs in a line "in front of the booking counter" for people who are waiting to be processed, released, go to court, or see the magistrate, and "inconveniently in the middle of that" is the phone bank for inmates to make calls. Lieutenant Penkey explained that those phones are not for the general population inmates, but that such inmates "sometimes use them."

Lieutenant Penkey also testified that people in the waiting area are generally not handcuffed, and, although the deputies try to keep people "separated as much as [they] can," there are no physical barriers in the waiting area. He stated that the individual cells were for people who needed close observation, but that it is generally "best not to isolate" people during the first 72 hours, so they put detainees in the group cells unless "there's something about the person's behavior that prevents us from doing that."

Regarding Jail procedures, Lieutenant Penkey stated that detainees are brought in to a sally port for an initial search, and their property is taken for inventory and to ensure safety before they move into the booking area. He stated that a police officer informs the deputy of the charges against the detainee, and the deputy contacts the sergeant to make a determination about a strip search if the detainee was charged with a drug or weapons violation, or if drugs or weapons were found on the person. He said that the sergeant makes that determination based on the charges and the circumstances of the arrest. He testified that the deputies "keep[] an eye on" the detainees in the booking area, and detainees are "pretty much" always escorted within

5

booking, but there is not a "one on one escort if they walk over to the restroom" next to the booking counter.

The circuit court granted Cole's motion to suppress the evidence recovered from the strip search (Strip Search Evidence), on the grounds that *Florence* was distinguishable, that a "higher standard" applies to the strip search of a detainee prior to him or her being taken before a magistrate, and that "without any particularized suspicion as to whether or not [Cole] was hiding drugs on his person," "such a search as the one that happened in this case, would be a violation of his Fourth Amendment rights."

PRETRIAL APPEAL OF MOTION TO SUPPRESS

The Commonwealth filed a pretrial appeal of the ruling on the motion to suppress with the Court of Appeals of Virginia. *Commonwealth v. Cole*, Record No. 1744-14-4, 2015 Va. App. LEXIS 53 (Feb. 13, 2015). Upon consideration of the matter, the Court of Appeals reversed the circuit court's decision to grant the motion to suppress the Strip Search Evidence. The Court of Appeals concluded that *Florence* authorized the "visual body cavity search" of Cole, because even though he had not yet been processed into the Jail's general population, he "was being admitted to the booking area where he would commingle with detainees who committed crimes ranging in severity, were at various stages of the booking or commitment process, and all of whom presented possible opportunities for [Cole] to 'pass off' the drugs hidden on his person." *Id.* at *16. The case was returned to the circuit court for trial. *Id.*

TRIAL

The circuit court held a bench trial on May 20, 2015, and Cole renewed his objection to the admission of the Strip Search Evidence. Officer Moore and Deputy Roland testified substantially the same as they had during the hearings on the motion to suppress. The court

6

admitted the Certificate into evidence following expert testimony from a forensic scientist regarding the analysis of the contents of the bag corners that tested positive for cocaine.

Detective Keith Burkholder (Detective Burkholder), a vice and narcotics detective with the Alexandria Police Department, testified as an expert "in the area of narcotics use and distribution." He stated that he had not seen a drug user carry more than 1.0 gram of crack cocaine, and that an individual dosage unit is approximately 0.1 grams. He testified that individual packaging of drugs in different sizes was for different types of users, and that he would not expect an individual user to have "this weight" of individually wrapped blocks of cocaine. He opined that the "possession of approximately 5 plus grams of crack cocaine broken into individually wrapped baggies held by a defendant in his buttocks," as well as $600 in cash and no smoking device, was inconsistent with personal use.

At the conclusion of the Commonwealth's evidence, Cole moved to strike the charge of possession with intent to distribute cocaine, arguing that there was insufficient evidence to establish an intent to distribute, as there was no direct evidence of drug dealing activity, and the circumstantial evidence was not inconsistent with a reasonable hypothesis of innocence that Cole was simply a user and not a dealer. The court denied the motion. Cole did not present evidence, and renewed his motion to strike, which the court denied. The court found Cole guilty of possession with intent to distribute cocaine, and sentenced him to 10 years' incarceration with all but three years suspended.

POST-TRIAL APPEAL

Cole appealed the conviction for possession with intent to distribute cocaine to the Court of Appeals. The Court of Appeals denied the petition for appeal by per curiam order. It asserted that its review of its ruling on the motion to suppress and the constitutionality of the strip search

7

under *Florence* was "precluded by the 'law of the case' doctrine" due to its ruling in the pretrial appeal. *Cole v. Commonwealth*, Record No. 1201-15-4 (April 18, 2016). It also concluded that the evidence was sufficient to uphold the conviction for possession with intent to distribute cocaine, because: (1) Cole possessed approximately five grams of crack cocaine and five grams of a "substance visually consistent with crack cocaine" packaged in "baggie corners," but not a "smoking device" to ingest the cocaine; (2) he kept the cocaine in his buttocks and "attempted to swallow the fourteen rocks when the officers noticed the plastic bag in his buttocks;" (3) he possessed $600 in cash; and (4) Detective Burkholder's expert testimony was that the evidence was inconsistent with personal use. *Id.* A three-judge panel denied Cole's appeal for the reasons stated in the per curiam order. Cole appeals.

ANALYSIS

Cole claims the Court of Appeals erred by (i) refusing to reconsider its determination in the pretrial appeal based upon the law of the case doctrine; (ii) affirming the denial of his motion to suppress and allowing the admission of the Strip Search Evidence; and (iii) ruling that the evidence presented at trial was sufficient to affirm his conviction for possession with intent to distribute cocaine.

*1. Reconsideration of the Pretrial Appeal Ruling*

In his first assignment of error, Cole argues that the Court of Appeals erred in concluding that the law of the case doctrine precluded it from reconsidering the issue of the motion to suppress, which was the subject of the pretrial appeal to the Court of Appeals. Although the Commonwealth asserts that Cole's conviction should be affirmed on other grounds, it agrees with Cole that the Court of Appeals did have the authority to reconsider the ruling on the motion to suppress on direct appeal.

8

This Court reviews de novo both the interpretation of the statutes governing an interlocutory appeal to the Court of Appeals and whether the Court of Appeals was bound by the law of the case doctrine. *See Miller-Jenkins v. Miller-Jenkins*, 276 Va. 19, 28, 661 S.E.2d 822, 827 (2008); *Commonwealth v. Amos*, 287 Va. 301, 305, 754 S.E.2d 304, 306 (2014). In doing so, "[w]e apply the plain meaning of the language appearing in the statute unless it is ambiguous or applying the plain language leads to an absurd result." *Amos*, 287 Va. at 305-06, 754 S.E.2d at 306-07.

Code § 19.2-398(A)(2) provides that, in a felony case, the Commonwealth may pursue a pretrial appeal to the Court of Appeals from an "order of a circuit court prohibiting the use of certain evidence" obtained in violation of the Fourth Amendment. Code § 19.2-409 concerns the finality of a decision in such a pretrial appeal:

> Such finality of the Court of Appeals' decision *shall not preclude a defendant*, if he is convicted, *from requesting the Court of Appeals or Supreme Court on direct appeal to reconsider an issue which was the subject of the pretrial appeal*.

Code § 19.2-409 (emphases added). The statutes generally governing the finality of a decision of the Court of Appeals similarly provide that the Court of Appeals may review a decision rendered in a pretrial appeal if a defendant is subsequently convicted. *See* Code § 17.1-410(A).

Thus, pursuant to Code §§ 17.1-410 and 19.2-409, the Court of Appeals was authorized to reconsider the constitutionality of the strip search and the admissibility of the Strip Search Evidence when those questions were presented on direct appeal after the defendant's conviction. It erred in failing to do so.

*2. Admission of the Strip Search Evidence*

The second assignment of error alleges that the Court of Appeals erred in its pretrial ruling which denied Cole's motion to suppress and allowed the admission of the Strip Search

9

Evidence at trial. We must determine if the pretrial ruling of the Court of Appeals on the motion to suppress was in error.

At the initial hearing on a motion to suppress, the Commonwealth "carries the burden of showing that a warrantless search and seizure was constitutionally permissible." *Jackson v. Commonwealth*, 267 Va. 666, 673, 594 S.E.2d 595, 598 (2004); *Reel v. Commonwealth*, 31 Va. App. 262, 265, 522 S.E.2d 881, 882 (2000). On appeal, a

> defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review de novo . . . . In making such a determination, we give deference to the factual findings of the circuit court, but we independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment. The defendant has the burden to show that, considering the evidence in the light most favorable to the Commonwealth, the circuit court's denial of his suppression motion was reversible error.

*Cost v. Commonwealth*, 275 Va. 246, 250, 657 S.E.2d 505, 507 (2008) (internal citations omitted).

Cole claims that the Court of Appeals erred in reversing the trial court's decision to grant Cole's motion to suppress based upon an incorrect interpretation of *Florence*, a case involving the strip search of a newly-arrived detainee to a jail. However, because the search of Cole occurred in a jail after his arrest, we must first consider the general principles regarding constitutional protections for inmates and detainees, before turning to the specific question of strip searching newly-arrived detainees.

We note that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (citing *Price v. Johnston*, 334 U.S. 266, 285 (1948)). However, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," and "pretrial detainees, who have not been

10

convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "[T]he touchstone of [Fourth] Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy," because the "Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable." *Williams v. Commonwealth*, 259 Va. 377, 385, 527 S.E.2d 131, 135 (2000) (citations and internal quotation marks omitted).

Assuming that "inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility," their right is to be protected from *unreasonable* searches. *Bell*, 441 U.S. at 558. Whether a search is reasonable is a fact-specific inquiry that "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id*. at 559. This balancing inquiry requires courts to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id*.

Thus, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Bell*, 441 U.S. at 545. Instead, "[t]here must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application," and this "principle applies equally to pretrial detainees and convicted prisoners." *Id*. at 546 (citation and internal quotation marks omitted). The "institutional needs and objectives" of a jail "that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees"

11

include "maintaining institutional security and preserving internal order and discipline." *Id*. at 546. "[E]ven when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id*. at 547. As the Supreme Court of the United States concluded:

> Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell*, 441 U.S. at 547-48 (quoting *Pell*, 417 U.S. at 827).[5]

In light of these considerations, the Supreme Court upheld a policy requiring strip searches of detainees "after every contact visit with a person from outside" the detention facility, even without probable cause. *Bell*, 441 U.S. at 558-60 (citations and internal quotation marks omitted). Without "underestimat[ing] the degree to which these searches may invade the personal privacy of inmates," the Court noted that a "detention facility is a unique place fraught with serious security dangers," that the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence," and that "inmate attempts to secrete these items into the facility by concealing them in body cavities" were well-documented. *Id*. at 559-60.

---

[5] *Bell* arose in the context of a federal habeas corpus proceeding, and *Florence* was an action under 42 U.S.C. § 1983. Thus, those cases involved different remedies than that sought here, which is the suppression of evidence allegedly obtained in violation of the Fourth Amendment. However, the underlying analysis of the applicable constitutional protections in those cases is independent of the specific remedy sought, and so guides our analysis here. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("It is for violations of such constitutional and statutory rights that 42 U.S.C. § 1983 authorizes redress; that section is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.").

"Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," the Court concluded that the general strip search policy did not violate the Fourth Amendment. *Id*. at 560.

*Bell* accordingly set forth a general proposition that strip searches of inmates and detainees would not violate the Fourth Amendment if they were reasonable in light of institutional security interests, and that, "'in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Bell*, 441 U.S. at 547-48 (quoting *Pell*, 417 U.S. at 827). *Florence* tested whether there should be an exception to this general proposition for detainees who were arrested for minor offenses and for whom jail officials did not have particular reason to suspect "of concealing a weapon, drugs, or other contraband." *Florence*, 566 U.S. at 324. *Florence* began by acknowledging that *Bell* "is the starting point for understanding how this framework [for upholding "a regulation impinging on an inmate's constitutional rights . . . if it is reasonably related to legitimate penological interests"] applies to Fourth Amendment challenges." *Florence*, 566 U.S. at 326 (internal quotation marks omitted). The Court then considered "whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed," and "whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband." *Id*. at 322, 330.

The Court cautioned that the "difficulties of operating a detention center must not be underestimated by the courts," and that "[m]aintaining safety and order at these institutions

13

requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id*. at 326. Thus,

> correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities. The task of determining whether a policy is reasonably related to legitimate security interests is "peculiarly within the province and professional expertise of corrections officials." This Court has repeated the admonition that, "*in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment* in such matters."

*Id*. at 328 (quoting *Bell*, 441 U.S. at 548) (emphasis added).

The Court concluded that a jail policy to strip search every new detainee entering the general population of a jail, including those arrested for minor offenses, "struck a reasonable balance between inmate privacy and the needs of the institutions," such as the need to detect illness, gang membership, and contraband. *Florence*, 566 U.S. at 322-25, 330-34, 339. The Court rejected Florence's proposal to exempt those arrested for minor offenses or without a "reasonable suspicion of a concealed weapon or other contraband" from such standard searches. The Court concluded that such an exemption would put those detainees at greater risk from those trying to get contraband into jails and result in more contraband entering such facilities. *Id*. at 336-38. It also observed that the information needed to make such a determination regarding exemption was not available to jail officials when processing new detainees, and so would not allow for the operation of a "readily administrable rule" for law enforcement officials. *Id*. at 330, 336-38.

Although the Court concluded in *Florence* that a general policy to strip search inmates entering a general jail population was reasonable under the Fourth Amendment, it did not reach the specific situation presented in this case of a detainee being held in a jail before seeing a magistrate. Four of the five Justices in the *Florence* majority joined Part IV of the opinion which

14

noted: "This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id*. at 338-39. Part IV addresses the concurrences written by Chief Justice Roberts and Justice Alito, which express concern that the Court not foreclose the possibility that some strip searches of new detainees might violate the Fourth Amendment, particularly for those detainees "who could be held in available facilities apart from the general population." *Id*. at 341 (Alito, J., concurring). Nonetheless, *Florence* informs our analysis by outlining some of the factors to be considered in determining whether a strip search of an inmate or detainee is reasonable under the Fourth Amendment.[6]

As the Court noted in *Florence*, "[c]orrectional officials have a significant interest in conducting a thorough search as a standard part of the intake process," as "[j]ails and prisons . . . face grave threats posed by the increasing number of gang members who go through the intake process," and there is also a danger of introducing contagious diseases or not detecting a detainee's "wounds or other injuries requiring immediate medical attention." 566 U.S. at 330-31. "Detecting contraband concealed by new detainees, furthermore, is a most serious

---

[6] Several federal courts of appeals have considered the limits of *Florence*, and have concluded that general strip search policies for new detainees are constitutional as a reasonable response to the needs of jail security. *See, e.g.*, *Mabry v. Lee Cty.*, 849 F.3d 232, 236-39 (5th Cir. 2017) (holding constitutional a strip search of a juvenile defendant arrested for a violent offense and who briefly entered the general population of a juvenile detention center); *Augustin v. Nassau Cty. Sheriff's Dep't (In re Nassau Cty. Strip Search Cases)*, 639 F. Appx 746, 750-51 (2d Cir. 2016) (concluding that a policy to strip search all new detainees was constitutional under *Florence*, because those detainees "'arrested on misdemeanor charges unrelated to weapons or drugs'" were mixed with detainees arrested for felony charges) (citation omitted); *United States v. Fowlkes*, 804 F.3d 954, 961, 966-67 (9th Cir. 2015) (noting *Florence*'s approval of "suspicionless visual strip searches" in the prison intake and jail booking context).

15

responsibility," since "[w]eapons, drugs, and alcohol all disrupt the safe operation of a jail." *Id*. at 332.

All of these factors—the danger of disease, gang-based violence, and the disruption of jail safety due to an underground economy trading in contraband—are even more important when people are detained in groups, because that is when the opportunity arises for disease transmission, violence, and illicit trade in, or competition for access to, contraband. Indeed, the Court observed that the introduction of contraband "could happen any time detainees are held in the same area, including in a van on the way to the station or in the holding cell of the jail." *Id*. at 335-36.

Here, the Jail's policy is for supervisors to authorize a strip search of incoming detainees, such as Cole, who have been charged with offenses involving drugs, weapons, or violence. Such detainees are held in the booking area, a "very mixed use" part of the Jail where the detainees are generally kept in group cells, are not handcuffed, and are able to move around the waiting area with some degree of freedom, such as going to the restroom unescorted. In these circumstances, many, if not all, of the factors motivating the Supreme Court's decision in *Florence* apply to the Jail. Here, Cole's detention in the booking area of the Jail presented similar concerns as noted regarding Florence's detention.

In light of the evidence presented, there is no "'substantial evidence' demonstrating [the Jail's] response to the situation is exaggerated," so "deference must be given to the officials in charge of the [J]ail." *Id*. at 330 (citation omitted). We also note, without deciding whether such additional restrictions are necessary, that the Jail's policy to strip search only those new detainees charged with offenses involving drugs, weapons, or violence, and only with approval from a supervisor, further demonstrates that the Jail's response to legitimate security interests

16

was reasonable. Finally, we note that, although Cole's argument was made in the context of the inevitable discovery doctrine before the circuit court, he effectively acknowledged that he would have the opportunity to dispose of the Strip Search Evidence while in booking and prior to his transfer to the Jail's general population.[7] This acknowledgement affirms that the Jail's security concerns were legitimate, and that its policy to strip search new detainees charged with offenses involving drugs, weapons, or violence was a reasonable response to those concerns.

Accordingly, we hold that the Court of Appeals did not err by reversing the circuit court's initial decision to grant Cole's motion to suppress the Strip Search Evidence. Thus, although the Court of Appeals erroneously declined to reconsider its pretrial decision, the Court of Appeals' judgment was correct in concluding that there was no constitutional infirmity in the admission of the Strip Search Evidence, and we affirm that part of the Court of Appeals' judgment. *Perry v. Commonwealth*, 280 Va. 572, 579, 701 S.E.2d 431, 435 (2010) ("Under the right result for the wrong reason doctrine, it is the settled rule that however erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons.") (alteration, citation, and internal quotation marks omitted).

*3. Sufficiency of the Evidence for Possession with Intent to Distribute Conviction*

Regarding the third assignment of error and the sufficiency of the evidence for possession with intent to distribute cocaine, a circuit court's conviction is "entitled to the same weight as a jury verdict and will not be disturbed on appeal unless 'plainly wrong or without evidence to

---

[7] Cole, arguing the motion to suppress in the circuit court, asserted that the Strip Search Evidence would not be admissible under the inevitable discovery rule, because it was not inevitable that a strip search upon his admission into the general population of the Jail would reveal the Strip Search Evidence. One of the reasons articulated for why the Strip Search Evidence would not have been inevitably discovered was that there was "a break between him coming into booking and him going into [general] population . . . where he is interacting with other individuals, or at least is mixed in with other individuals in the booking area. So there's no indication . . . this item would have been found or still have been on his person."

17

support it.'" *Williams v. Commonwealth*, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009) (quoting Code § 8.01-680). When reviewing the sufficiency of the evidence, "we review the evidence in the light most favorable to the Commonwealth, according it the benefit of all reasonable inferences fairly deducible therefrom." *Singleton v. Commonwealth*, 278 Va. 542, 548, 685 S.E.2d 668, 671 (2009).

Pursuant to Code § 18.2-248(A), it is "unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance . . . ." Cole concedes that the evidence was sufficient to establish that he possessed cocaine, and only challenges the sufficiency of the evidence to establish his intent to distribute cocaine.

"Absent a direct admission by the defendant, intent to distribute must necessarily be proved by circumstantial evidence." *Williams*, 278 Va. at 194, 677 S.E.2d at 282. Circumstantial evidence that may be probative of an intent to distribute a controlled substance includes: "the quantity of the drugs seized, the manner in which they are packaged, and the presence of an unusual amount of cash, equipment related to drug distribution, or firearms," and whether the quantity of drugs was "inconsistent with personal use." *McCain v. Commonwealth*, 261 Va. 483, 493, 545 S.E.2d 541, 547 (2001); *Williams*, 278 Va. at 194, 677 S.E.2d at 282. *See also Commonwealth v. White*, 293 Va. 411, 416, 423-24, 799 S.E.2d 494, 496, 500-01 (2017) (considering the sufficiency of evidence of drug distribution, including a large amount of cash and drugs sorted into various weights, as well as expert testimony that the items found on the defendant were inconsistent with personal use, to determine whether the admission of other evidence was harmless). "[Q]uantity, alone, may be sufficient to establish such intent [to distribute] if it is greater than the supply ordinarily possessed for one's personal use," whereas

18

"possession of a small quantity creates an inference that the drug was for the personal use of the defendant;" however, that presumption can be rebutted by factors such as packaging for distribution and the presence of paraphernalia to use the drugs. *Dukes v. Commonwealth*, 227 Va. 119, 122, 313 S.E.2d 382, 383 (1984); *Servis v. Commonwealth*, 6 Va. App. 507, 524-25, 371 S.E.2d 156, 165 (1988).

Considered in the light most favorable to the Commonwealth, the evidence was sufficient to establish Cole's intent to distribute the cocaine. Even considering only the amount of cocaine that was confirmed by forensic testing, Cole had at least five rocks of cocaine weighing over five grams collectively. Based on these amounts and Detective Burkholder's testimony, Cole had at least five times the amount of cocaine that a typical user would carry, and at least 50 dosage units. Detective Burkholder's expert opinion was that "possession of approximately five plus grams of crack cocaine broken into individually wrapped baggies held by a defendant in his buttocks," as well as $600 in cash and no smoking device, was inconsistent with personal use. Accordingly, the Court of Appeals did not err in determining that the circuit court was not plainly wrong or without evidence to support its conviction of Cole for possession of cocaine with the intent to distribute.

CONCLUSION

The judgment of the Court of Appeals is reversed regarding its ruling on the law of the case doctrine. However, it is affirmed regarding its rulings on the admission of the Strip Search Evidence and Cole's conviction for possession of cocaine with the intent to distribute. Final judgment will be entered here for the Commonwealth.

*Reversed in part,*
*affirmed in part,*
*and final judgment.*

19