COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Athey and Callins
Argued at Richmond, Virginia


WAYNE WILLIAM PETROSKI

                                                          MEMORANDUM OPINION[*] BY
v.        Record No. 0639-24-1                            JUDGE RICHARD Y. ATLEE, JR.
                                                                 JUNE 17, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Tanya Bullock, Judge

Eric Weathers, Assistant Public Defender (Virginia Indigent Defense
Commission, on briefs), for appellant.

Rebecca Johnson Hickey, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Wayne William Petroski appeals his convictions and sentence for possessing with intent

to distribute methamphetamine, selling or distributing methamphetamine for profit, and

possessing psilocyn mushrooms.[1] He argues that the trial court erred by denying his motion to

suppress evidence obtained from a warrantless search of his backpack. He also challenges the

sufficiency of the evidence supporting his two methamphetamine convictions. Finally, he argues

that the trial court erred declining to apply the accommodation sentence reduction in Code

§ 18.2-248(D). We affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The parties below used the terms "psilocybin" and "psilocyn" (or "psilocin") largely
interchangeably. They are in fact different substances. Code § 54.1-3446(3). "Psilocin is the
metabolite of psilocybin, which is the active ingredient in hallucinogenic mushrooms." *State v.
Hotz*, 795 N.W.2d 645, 649 (Neb. 2011). We use "psilocyn" in this opinion because that is the
term used in the certificates of analysis.

## I. BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In July 2022, Virginia Beach Police Detective Benjamin Flynn received "specific information" that someone known as "Old Dirty" or "Old Dirty Bastard" would be selling methamphetamine, mushrooms, and marijuana on the boardwalk near the 17th Street Dairy Queen.[2] Flynn had encountered Petroski before and knew that he went by that nickname. Flynn located Petroski at a bench about three blocks south of the Dairy Queen with a bicycle and several bags. Flynn directed city camera operator Stephen Fesko to watch Petroski and alert the police of any suspicious activity.

Flynn reviewed footage of two relevant encounters before approaching Petroski. First, around 8:56 p.m., Petroski dug through a backpack while a man Flynn knew as "Wild Bill" sat on a nearby bench. Petroski removed what looked like a plastic bag and handed it to Wild Bill. The recording did not show Wild Bill give Petroski any money in return before leaving the scene. Another officer intercepted Wild Bill and reported to Flynn "[n]othing conclusive, but the potential of a marijuana transaction."

Second, shortly before 9:30 p.m., James Ellis approached Petroski on a bicycle. After speaking to Ellis for a few minutes, Petroski again rummaged through his backpack, ripped off

_____

[2] The informant had assisted Flynn before and had been "very reliable."

the corner of a clear plastic bag, and twisted it at the top. Petroski then handed something to Ellis, and Ellis handed Petroski money, which Petroski then appeared to count.

Flynn believed that the second transaction gave him reasonable suspicion to detain Petroski. Flynn and several other officers arrived and handcuffed Petroski and Ellis. Flynn and another officer led Petroski several yards away from the bench, where Petroski's backpack remained. Detective Andrew Crandall questioned Ellis; Ellis initially denied that Petroski had given him anything and claimed that he had given Petroski $25 to satisfy a prior debt. Upon further questioning, Ellis admitted that Petroski gave him "ice," which he had dropped on the ground when he saw the police. "[D]irectly between [Ellis's] feet on the ground" was a "ripped-off piece of plastic kind of made into a corner baggie" and twisted closed, containing a "white, crystal substance." Ellis denied that the money was for the drugs but admitted that he had bought drugs from Petroski a couple of times. He estimated that the amount of methamphetamine Petroski gave him was worth around $20.

While Crandall questioned Ellis, Flynn spoke to Petroski and reminded him of an encounter about a year earlier when Petroski had refused to give Flynn consent to search Petroski's belongings, which Flynn stated "kind of sparked some interest with [him]." Flynn testified at the pretrial suppression hearing that Petroski was under arrest once Ellis admitted to receiving methamphetamine. After that admission, Flynn "went directly to the top of the backpack" and "began searching." Petroski remained several yards away during the search, which began about seven minutes after the police handcuffed him. In the backpack's top pocket, Flynn found a pink Bubble Tape container with two baggies of methamphetamine inside, another loose baggie containing methamphetamine, and a sandwich bag containing psilocyn mushrooms. He also found marijuana, a scale, and syringes elsewhere in the backpack. Petroski had $91.30 in cash in his wallet.

When asked at the pretrial suppression hearing what the police did with Petroski's property, Flynn responded, "[s]tandard procedure. We searched everything, inventoried everything, took his bike back to the precinct, and . . . personal property was vouchered." He testified that they did not leave the backpack on the bench because "[a]ny prisoner property, we have to take account of and properly voucher." He testified at the suppression hearing that he "believe[d]" that the property was vouchered at the jail but later testified at trial that the property was vouchered at the police precinct. According to Flynn, Petroski asked that his bicycle be vouchered as his personal property and also "asked for his cane and just all his belongings." Flynn admitted having a dual purpose when he searched the backpack at the scene, stating that "we have to see what belongs to the Defendant and identify it in our voucher sheet, and also see if there's anything illegal inside of it."

Petroski moved to suppress the evidence obtained from the warrantless search of his backpack, raising "two different arguments." First, he argued that the police did not have reasonable, articulable suspicion to detain him, rendering the post-detention search unlawful. In doing so, he also contended that Flynn could not rely on his prior knowledge of Petroski to justify the detention. Second, he argued that, even if the initial detention was lawful, Flynn lacked probable cause to search the backpack because Ellis's statements were unreliable. In a written response, the Commonwealth argued that the officers had reasonable suspicion to detain Petroski and probable cause to arrest him and that the search was either a search incident to a lawful arrest or was justified under the community caretaker exception to the warrant requirement. The Commonwealth did not argue at the suppression hearing.

After listening to Petroski's argument, the trial court explained that the informant's tip, Ellis's statements, the evidence on the ground near Ellis's feet, and the camera footage gave the

officers reasonable suspicion and probable cause, so "the search was a valid search." Accordingly, the court denied Petroski's suppression motion.

The case proceeded to a jury trial, where the Commonwealth presented testimony from Flynn, Crandall, and Fesko.[3] Additionally, the Commonwealth's forensic expert Kevin Zencak tested the substances in the baggies that had been removed from Petroski's backpack and determined that they contained a total of 4.44 grams of methamphetamine and 12.06 grams of psilocyn mushrooms. The baggie recovered near Ellis's feet contained 0.763 gram of methamphetamine. The Commonwealth's narcotics expert Detective Edward Filio testified that the baggie by Ellis's feet was consistent with personal use but that the amount of methamphetamine in Petroski's possession was not. According to Filio, the common sales unit for methamphetamine was "[p]robably less than a gram" or "[a] gram." And he testified that a scale was a common tool of drug distribution. Filio, Flynn, and Crandall each testified that, based on their training and experience, tearing a section off a plastic bag and twisting it closed was a common way of packaging drugs for distribution.

After hearing the evidence and arguments, the jury found Petroski guilty of selling or distributing a controlled substance for profit, possessing with intent to distribute methamphetamine, and possessing psilocyn.

At sentencing, Petroski argued that he had provided methamphetamine to Ellis only as an accommodation and asked the trial court to reduce his sentence under Code § 18.2-248(D). He argued that the Commonwealth had not proven that the money Ellis gave Petroski was for the

---

[3] The Commonwealth did not present evidence at trial of Petroski's interaction with Wild Bill but instead submitted a video that showed only Petroski's interaction with Ellis. Neither party submitted Crandall's body camera footage showing his questioning of Ellis, though Petroski played portions of it while cross-examining Crandall. Crandall testified that, while he was questioning Ellis, Ellis's demeanor changed, he lowered his voice, and looked down at the ground, where Crandall found the baggie of methamphetamine. He did not testify about any of Ellis's statements.

methamphetamine, relying primarily on Ellis's statements to Crandall. The trial court denied Petroski's request, finding that he had "engaged in a commercial transaction," not an accommodation. The court then sentenced Petroski to 17 years' incarceration with 11 years and 6 months suspended. Petroski now appeals.

II. ANALYSIS

A. *Petroski's Suppression Motion*

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Baskerville v. Commonwealth*, 76 Va. App. 673, 681 n.1 (2023) (quoting *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017)). A defendant's "claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact." *Carter v. Commonwealth*, 79 Va. App. 329, 339 (2023) (quoting *Merid v. Commonwealth*, 72 Va. App. 104, 108-09 (2020)). We are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." *Id.* (quoting *Merid*, 72 Va. App. at 109). But we review de novo "the overarching question of whether a search or seizure violated the Fourth Amendment." *Id.* (quoting *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021)). When considering whether to affirm the denial of a suppression motion, "an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial." *Tirado v. Commonwealth*, 296 Va. 15, 24 (2018) (quoting *Commonwealth v. White*, 293 Va. 411, 414 (2017)).

"The Fourth Amendment protects individuals from unreasonable searches and seizures." *Parady v. Commonwealth*, 78 Va. App. 18, 28 (2023). "[W]arrantless searches are *per se* unreasonable, subject to a few specifically established and well-delineated exceptions." *Lee v. Commonwealth*, 80 Va. App. 694, 702 (2024) (alteration in original) (quoting *Megel v.*

*Commonwealth*, 262 Va. 531, 534 (2001)).  The Commonwealth has the burden to prove that a warrantless search fell within one of the exceptions.  *Parady*, 78 Va. App. at 29.

In the trial court, in its response to the motion to suppress, the Commonwealth argued that the warrantless search was justified as a search incident to a lawful arrest[4] or, alternatively, as under the community caretaker exception.[5]  Petroski argues on appeal that neither exception applies.  First, he argues that the search was not incident to a lawful arrest because the backpack was not within his immediate control at the time of the search.  Second, he argues that the search was plainly investigatory and thus not valid under the community caretaker exception.  Petroski made neither of those arguments below.[6]

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."  Rule 5A:18.  The objection "must be

---

[4] "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."  *Chimel v. California*, 395 U.S. 752, 762-63 (1969).  Thus, when the police lawfully arrest a suspect, they may search the suspect's person and the area "within his immediate control."  *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quoting *Chimel*, 395 U.S. at 763).  But "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search," the justifications for the exception evaporate.  *Id.*

[5] Under the community caretaker exception, an officer may search a closed container without a warrant if he or she has "an objectively reasonable belief" that the search "is necessary to provide aid or to protect members of the public from physical harm."  *Knight v. Commonwealth*, 61 Va. App. 297, 306 (2012).  "[T]he warrantless entry must be 'totally divorced' from a criminal investigation" for the exception to apply.  *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).

[6] It is not clear which exception the trial court relied on, if any, to deny the motion to suppress.  The court simply found that the officers had probable cause and that "the search was a valid search."  Probable cause alone cannot justify a warrantless search.  *Parady*, 78 Va. App. at 24.  But Petroski did not make that argument below either.  Rather, he argued that the search was unlawful because the police lacked probable cause, an argument the trial court explicitly rejected.  Petroski does not challenge the trial court's probable cause finding on appeal, which he interprets as "just a necessary component of the trial court's ruling that the search was justified as a search incident to arrest, not an alternative basis on its own."

both *specific* and *timely*." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (quoting

*Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). "Making one specific argument on

an issue does not preserve a separate legal point on the same issue for review." *Edwards v.*

*Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc). A contemporaneous objection allows

opposing counsel and the trial court a fair opportunity to address the challenge and prevent

unnecessary appeals and retrials. *Bethea*, 297 Va. at 743-44.

We reject Petroski's argument that his suppression motion sufficiently alerted the trial court

to the arguments he now makes on appeal. Certainly, asserting that a warrantless search is

unconstitutional implies that none of the warrant exceptions justified the search. But that differs

from making a *specific* argument about why a particular exception does not apply. Indeed, to the

extent Petroski's argument below should be read as challenging the police's probable cause to arrest

him, that is an altogether different argument for why the search was not incident to a lawful arrest

than the one he now raises. In short, that Petroski made some Fourth Amendment arguments does

not preserve all other Fourth Amendment arguments. *Edwards*, 41 Va. App. at 760.

Petroski argues that we should apply the ends of justice exception to Rule 5A:18 "to

avoid the denial of [his] essential rights to be free from unreasonable searches." "The ends of

justice exception is narrow and is to be used sparingly." *Cornell v. Commonwealth*, 76 Va. App.

17, 31 (2022) (quoting *Conley v. Commonwealth*, 74 Va. App. 658, 682 (2022)). It "applies only

in the extraordinary situation where a miscarriage of justice has occurred." *Conley*, 74 Va. App.

at 682 (quoting *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc)). "Whether to

apply the ends of justice exception involves two questions: '(1) whether there is error as

contended by the appellant; and (2) whether the failure to apply the ends of justice provision

would result in a grave injustice.'" *Id.* at 682-83 (quoting *Commonwealth v. Bass*, 292 Va. 19,

27 (2016)). "[T]o avail oneself of the exception, a defendant must affirmatively show that a

miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Cornell*, 76 Va. App. at 31 (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 221 (1997)). "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Id.* (quoting *Conley*, 74 Va. App. at 683). The error must be not only "substantial and material" but also "clear." *Merritt v. Commonwealth*, 69 Va. App. 452, 460 (2018) (quoting *Masika v. Commonwealth*, 63 Va. App. 330, 333 (2014)).

We find no clear manifest injustice in this case. Even evidence obtained unlawfully may still be admissible if it "ultimately or inevitably would have been discovered by lawful means." *Knight v. Commonwealth*, 71 Va. App. 771, 787 (2020) (quoting *Carlson v. Commonwealth*, 69 Va. App. 749, 763 (2019)). Under this exception to the exclusionary rule, the Commonwealth must prove: "'(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct' and '(2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct." *Carlson*, 69 Va. App. at 763 (quoting *Commonwealth v. Jones*, 267 Va. 532, 536 (2004)). The "rule is most likely to be applied . . . 'where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later.'" *Knight*, 71 Va. App. at 788 (quoting 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(a), at 363-64 (5th ed. 2012)). "To justify a warrantless search, the standardized criteria must sufficiently limit a searching officer's discretion to prevent his search from becoming 'a ruse for a general rummaging in order to discover incriminating evidence.'" *Cantrell v. Commonwealth*, 65 Va. App. 53, 61 (2015) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).

Flynn testified that Petroski was under arrest once Ellis admitted to receiving methamphetamine, which happened before Flynn searched Petroski's bag. And he testified that

the police "ha[d] to take account of and properly voucher" "[a]ny prisoner property." Based on that testimony, once the police arrested Petroski, mandatory police procedure required them to take his backpack for inventorying rather than leave it on the bench while they took Petroski to jail. Although Flynn was not sure whether Petroski's property was inventoried at the jail or the police precinct, he was confident that it was inventoried. And although Flynn admitted having a dual purpose in searching the backpack at the scene, the question of whether that search was lawful is separate from the question of whether the evidence inevitably would have been later discovered. Flynn's testimony showed a reasonable probability that the evidence would have been discovered inevitably through a standardized procedure following arrest. Thus, Petroski did not establish that a miscarriage of justice occurred. Accordingly, we decline to apply Rule 5A:18's ends of justice exception.

B. *The Sufficiency of the Evidence*

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

In light of those principles, we are unpersuaded by Petroski's argument that the Commonwealth failed to prove that he possessed methamphetamine with the intent to distribute rather than for personal use. It is "unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give, or distribute a controlled substance." Code § 18.2-248(A). "Absent a direct admission by the defendant, intent to distribute must necessarily be proved by circumstantial evidence." *Cole v. Commonwealth*, 294 Va. 342, 361 (2017) (quoting *Williams v. Commonwealth*, 278 Va. 190, 194 (2009)). Such circumstantial evidence may include "'the quantity of the drugs seized, the manner in which they are packaged, and the presence of an unusual amount of cash, equipment related to drug distribution, or firearms,' and whether the quantity of drugs was 'inconsistent with personal use.'" *Id.* (quoting *McCain v. Commonwealth*, 261 Va. 483, 493 (2001)). "Circumstantial evidence, if sufficiently convincing, is as competent and entitled to the same weight as direct testimony." *Maust v. Commonwealth*, 77 Va. App. 687, 699 (2023) (en banc) (quoting *McCain*, 261 Va. at 493).

Petroski possessed 4.44 grams of methamphetamine packaged in three individual baggies, which Filio testified was inconsistent with personal use.[7] Petroski also had a digital scale in his backpack, which is a common tool of drug distribution. And the strongest evidence of Petroski's intent to distribute is that he actually distributed methamphetamine to Ellis. Petroski was recorded ripping the corner of a plastic bag and twisting it closed, which three of the Commonwealth's witnesses testified was a common mode of packaging drugs for

---

[7] Contrary to Petroski's argument, that some dealers in prior cases possessed a greater quantity of drugs does not mean that the quantity Petroski possessed was insufficient to prove intent. After all, even though "possession of a small quantity creates an inference that the drug was for the personal use of the defendant," the Commonwealth can rebut that presumption "by factors such as packaging for distribution." *Cole*, 294 Va. at 362 (quoting *Dukes v. Commonwealth*, 227 Va. 119, 122 (1984)). Here, there was expert testimony that the quantity of methamphetamine exceeded the typical amount for personal use and it was packaged in individual baggies. And the Commonwealth presented evidence of a hand-to-hand transaction.

distribution. He then handed something to Ellis and received money in return. While Crandall questioned Ellis, Ellis looked down toward the ground where there was a plastic baggie between his feet. That baggie was consistent with the one torn by Petroski and contained a common street level amount of methamphetamine. Given that evidence, a reasonable jury could conclude that Petroski possessed the requisite intent to distribute methamphetamine.

We also disagree that "the evidence did not sufficiently link the bag recovered from Ellis's feet to" Petroski. The video footage of the transaction established that link. Thus, the evidence was sufficient to support Petroski's conviction for selling or distributing a controlled substance.

C. *Accommodation*

Code § 18.2-248(D) allows for a reduced punishment if a defendant distributes drugs "only as an accommodation to another individual . . . and not with intent to profit thereby from any consideration received or expected nor to induce the recipient or intended recipient of the controlled substance to use or become addicted to or dependent upon such controlled substance." The defendant has the "burden to prove by a preponderance of the evidence that he distributed drugs as an accommodation." *Laney v. Commonwealth*, 76 Va. App. 155, 164 (2022). An accommodation claim raises an issue of fact that is resolved by the fact finder and which we review "with the highest degree of appellate deference." *Id.* (quoting *Joyce v. Commonwealth*, 56 Va. App. 646, 664 (2010)).

We disagree that "the record clearly showed that Mr. Petroski did not receive money from Ellis in exchange for methamphetamine." Petroski relies entirely on Ellis's statements to Crandall that he gave Petroski money to satisfy a prior debt, not to buy methamphetamine. But the trial court was not obligated to believe Ellis and could instead "conclude that he was lying to conceal his guilt" or to protect Petroski. *Newsome v. Commonwealth*, 81 Va. App. 43, 55 (2024). And the court could reasonably conclude that Ellis gave Petroski money contemporaneously with Petroski giving

- 12 -

Ellis methamphetamine because Ellis was buying that methamphetamine, especially given Ellis's admissions that he had bought methamphetamine from Petroski before. That conclusion was not plainly wrong or without evidence to support it. Accordingly, we affirm Petroski's sentence.

### III. CONCLUSION

For these reasons, the circuit court's judgment is affirmed.

*Affirmed.*