IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 3, 2018

**STATE OF TENNESSEE v. JOHNNY LORENZO WADE**

**Appeal from the Circuit Court for Madison County**
**No. 14-337     Kyle C. Atkins, Judge**

**No. W2017-00933-CCA-R3-CD**

The Defendant, Johnny Lorenzo Wade, was convicted by a jury of one count of first degree premeditated murder; two counts of first degree felony murder; two counts of especially aggravated robbery, a Class A felony; one count of attempted first degree murder, a Class A felony; and one count of aggravated assault, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-202, -13-403. The trial court merged one of the first degree felony murder convictions into the first degree premeditated murder conviction and the aggravated assault conviction into the attempted first degree murder conviction. Following a sentencing hearing, the trial court imposed a total effective sentence of life imprisonment plus forty years. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his convictions; (2) that the trial court erred in denying his suppression motion alleging that the seizure of his cell phone was illegal; (3) that the trial court erred by admitting a video taken from his cell phone because it was not relevant and its probative value was substantially outweighed by the danger of unfair prejudice; (4) that the trial court erred in admitting the statement of a co-defendant under the excited utterance exception to the hearsay rule; (5) that the trial court erred by allowing a witness to identify an item of evidence without personal knowledge of the item; (6) that the trial court erred in allowing an employee of the Defendant's cell phone provider to testify as an expert witness on the operation of the provider's cellular network; (7) that the trial court erred in allowing a police investigator to testify as a lay witness about "the plotting and pinging of the Defendant's cellular telephone records"; and (8) that the trial court abused its discretion by imposing partial consecutive sentences because such sentences "were excessive."[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

---

[1] For the sake of clarity, the issues have been reordered from how they appear in the Defendant's brief.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Johnny Lorenzo Wade.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; James G. Woodall, District Attorney General; and Benjamin C. Mayo, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The victims, Johnny Shivers; his wife, Chermaine Owens Shivers; their then sixteen-year-old son, Jonathan Shivers; and Ms. Shivers's twenty-one-year-old son, Markel Owens, lived on Walker Road in Jackson, Tennessee.[2] Around 9:30 p.m. on January 15, 2014, their neighbor, Joseph Mosely, was returning home with his family from church when he "saw some guys" standing around a white car. As he was walking into his house, Mr. Mosely heard someone say, "Go, go." Mr. Mosely heard gunshots a short time later.

Jonathan testified that Mr. Shivers had picked him up from basketball practice that night and that they were about to enter the backdoor of the house when two men came up behind them. Jonathan recalled that he "turned around and there was someone waving a gun at [his] face." Mr. Shivers and Jonathan walked into the kitchen of the house, and the two men followed them inside. One of the men had an orange shirt hanging out of the hooded sweatshirt he was wearing. According to Jonathan, that man went toward the living room where Mr. Owens was. The other man had on "bright orange shoes." That man stayed in the kitchen with Mr. Shivers and Jonathan. Both men had what looked like shirts covering their faces.

Jonathan testified that the men told them to get on the ground. Jonathan then heard a "lot of commotion" coming from the area of Ms. Shivers's bedroom. The man that was in the kitchen with him and Mr. Shivers went "forward to try to see what was going on." Jonathan testified that Mr. Shivers "got up and tried to stop them and started wrestling with the guy." Mr. Shivers "managed to get onto the ground while they [were] wrestling and [the man] pulled the trigger on [Mr. Shivers]." Jonathan recalled that the man shot Mr. Shivers three or four times. Jonathan testified that while this happened, he was on the ground "telling him not [to] shoot [Mr. Shivers]."

---

[2] Several individuals involved in this case share the same surname. We will refer to some individuals by their first names to avoid confusion. No disrespect is intended.

-2-

Jonathan testified that the man with the orange shoes also shot into the living room toward Mr. Owens and Ms. Shivers. After the man fired into the living room, Jonathan heard the other man yell, "'Cuz, you shot me." The man with the orange shoes told Jonathan "to get the money." Jonathan testified that he "ran back into the bedroom" and grabbed "a stack of cash" that belonged to Mr. Shivers. Jonathan gave the money to the man in the kitchen and then got back on the floor. Jonathan admitted that the money was from drug sales and that people would come to their house to buy drugs from Mr. Shivers. Jonathan estimated that all this happened in about five minutes.

Jonathan testified that by the time the men left the house, the shirts had fallen off their faces. Jonathan identified the Defendant as the man wearing the orange shoes who took the money from him and shot Mr. Shivers, Ms. Shivers, and Mr. Owens. Jonathan testified that he identified the Defendant from a photographic lineup on January 16, 2014. Jonathan also identified the Defendant's cousin and co-defendant, Derrick Wade, as the second robber. Jonathan also identified the Defendant and co-defendant in surveillance video footage taken later on the night of the robbery at Regional One Health in Memphis.

Ms. Shivers testified that she was in her bedroom on the night of January 15, 2014, when she saw "somebody walk through [the] living room." As she got up to investigate, a man with a gun walked into the bedroom and told her to get on the floor. Ms. Shivers could not see the man's face because it was covered. Mr. Owens then "ran in[to] the bedroom and started fighting" the man. Ms. Shivers testified that she "started helping [Mr. Owens] fight" and "heard a gunshot." The fight spilled out into the hallway and the living room where "there [were] just more shots." Ms. Shivers was not sure if the gun belonging to the man they were fighting ever went off.

Once in the living room, Ms. Shivers saw another man in "the kitchen area" pointing a gun "towards where [she] was." She also saw Mr. Shivers with his hands in the air. Ms. Shivers testified that the shots fired into the living room came from the "kitchen area" behind her. Ms. Shivers was shot in the leg. Ms. Shivers admitted that there was a significant amount of marijuana in the house that night because Mr. Shivers regularly sold it.

Investigators from the Jackson Police Department (JPD) found significant damage to the drywall in the hallway of the victims' home from Mr. Owens's struggle with the co-defendant. They also found two artificial fingernails in the living room that Ms. Shivers lost during the struggle. Two .40 caliber cartridge casings were found behind the couch in the living room. A third .40 caliber cartridge casing was found just outside the back entrance on a step. A fourth .40 caliber cartridge casing was found underneath Mr. Shivers's body. Investigators were also able to recover a bullet that struck Mr. Owens's cell phone and was lodged inside it. A "large quantity" of marijuana was found in a box in the bathroom of the house.

The co-defendant's ex-girlfriend, Megan Springfield, testified that she received a phone call from the co-defendant around 9:30 p.m. on January 15, 2014. The co-defendant told her "that he had been hit." Ms. Springfield testified that she met the co-defendant and the Defendant at an apartment complex in Jackson. She drove the co-defendant to the local hospital, but he refused to go inside. Instead, the co-defendant wanted to go to Memphis. Ms. Springfield testified that she went back to the apartment complex, picked up the Defendant, and that they all went to Regional One Health in Memphis.

Surveillance video footage showed the Defendant's and Ms. Springfield's assisting the co-defendant into the Regional One Health emergency entrance at 11:53 p.m. on January 15, 2014. In the footage, the Defendant had on a pair of orange shoes and the co-defendant was wearing an orange shirt. The co-defendant had been shot in the leg. The co-defendant registered under the Defendant's name. However, the co-defendant signed the discharge instructions with his own name. A resident physician, Doctor Henry Huang, removed a bullet from the co-defendant's leg. The bullet was placed in a specimen container and given to the Memphis Police Department who subsequently transferred the bullet to the JPD.

Ms. Springfield testified that the Defendant and the co-defendant would not tell her how the co-defendant was shot. Instead, the Defendant said that "[i]t wasn't supposed to happen like that" and that the co-defendant's "getting shot was an accident." When interviewed by the police, Ms. Springfield told the investigators that the Defendant "had a lot of money on him" that night. Ms. Springfield testified that when the Defendant saw the murders on the news, he laughed, was "[n]onchalant," and said that "he didn't do anything, he didn't kill [any]body."

Jeremy Gray testified that around the date of the murders, he wanted to purchase a handgun for "[p]rotection" and contacted the Defendant. Mr. Gray bought a .40 caliber Smith & Wesson from "[a] black dude with dreads" who "was in the car with" the Defendant. Mr. Gray testified that he sold the gun to Ereo Scates after he saw the Defendant on the news. The gun was recovered during a search of Mr. Scates's home in an unrelated matter on January 28, 2014.

The Defendant was arrested by Deputy United States Marshal Shane Brown on the morning of January 18, 2014, in Ripley. The Defendant's cell phone was "in his possession" when he was arrested and it was seized by Deputy Brown. Deputy Brown turned the cell phone over to the JPD. The Defendant denied involvement in the murders and claimed that he "was with a girl in Humboldt." However the Defendant refused to give investigators her name or phone number.

A search warrant was obtained for the data on the Defendant's cell phone. Investigators recovered photographs of the Defendant, the Defendant's orange shoes, and two guns from the Defendant's cell phone. The investigators also recovered a video dated December 13, 2013. The video showed the Defendant's firing a gun at a stop sign in a rural portion of Madison County. Investigators were able to determine the location as being off of Betty Manley Road and recovered eight .40 caliber cartridge casings from that area.

Investigators also subpoenaed the Defendant's cell phone records from his cell phone provider. The records revealed that the Defendant received several text messages from 9:18 p.m. to 9:25 p.m. on January 15, 2014, and that his cell phone pinged the cell-site closest to the victims' house for all of these messages. The records also revealed that the Defendant received phone calls at 8:37 p.m. and 9:38 p.m. and that his cell phone pinged the cell-site closest to his apartment for these phone calls.

Autopsies were performed on the bodies of Mr. Shivers and Mr. Owens by Doctor Feng Li, an expert in forensic pathology. Dr. Li determined that Mr. Shivers's manner of death was homicide and that the cause of death was "multiple gunshot wounds." Mr. Shivers suffered three gunshot wounds: a grazing wound to his right thigh, a through and through wound to his left lower leg, and a wound to his back just below his neck. The wound to Mr. Shivers's back was a contact wound, meaning that the gun was "against the skin when the bullet was . . . fired." That bullet traveled "from top to bottom, from the left to the right, and from the back to the front." Dr. Li recovered the bullet from the right side of Mr. Shivers's abdomen.

Additionally, Dr. Li determined that Mr. Owens's manner of death was homicide and that the cause of death was a "gunshot wound of the torso." The bullet entered Mr. Owens's left torso and traveled "from left to right and from top to bottom" injuring "both kidneys, intestines, and . . . the abdominal aorta." Dr. Li recovered the bullet from Mr. Owens's right abdominal wall.

Investigators sent the .40 caliber Smith & Wesson seized during the search of Mr. Scates's home to the Tennessee Bureau of Investigation (TBI) for forensic testing. They also sent the bullets recovered from Mr. Shivers, Mr. Owens, the co-defendant, and Mr. Owens's cell phone, along with the cartridge casings recovered from the victims' home and the location off Betty Manley Road. Ballistic testing by a TBI forensic scientist revealed that all of the bullets and cartridge casings had been fired from the .40 caliber Smith & Wesson.

Based upon the foregoing, the jury convicted the Defendant of one count of first degree premeditated murder for the killing of Mr. Shivers, two counts of first degree felony murder for the killings of Mr. Shivers and Mr. Owens during an attempted

robbery, two counts of especially aggravated robbery listing Mr. Shivers and Ms. Shivers as the victims, one count of attempted first degree murder involving Ms. Shivers, and one count of aggravated assault involving Ms. Shivers. The trial court merged the first degree felony murder conviction involving Mr. Shivers into the first degree premeditated murder conviction. The trial court also merged the aggravated assault conviction into the attempted first degree murder conviction. The Defendant now appeals to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The State responds that the Defendant has waived full appellate review of this issue due to deficiencies in his brief.

The Defendant's brief is inadequate with respect to this issue. The Defendant fails to make any argument beyond the following conclusory statement: "The Defendant respectfully submits that when the foregoing authorities [are] coupled with the facts presented by the prosecution at trial, the evidence was insufficient to support his convictions for first degree murder and attempted first degree murder."[3] As such, the Defendant has waived plenary appellate review of this issue and we will review it solely for plain error. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . will be treated as waived in this court").

The doctrine of plain error applies when all five of the following factors have been established:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018). A defendant's failure to establish any of these criteria requires denial of relief under the plain error doctrine, and "an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." Id. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

---

[3] The Defendant's brief contains a second, identical statement regarding "his convictions for felony murder." The brief also lists the elements of especially aggravated robbery, but the Defendant does not make even a cursory statement as to whether the State established those elements at trial.

Here, the Defendant has failed to show that consideration of the error is necessary to do substantial justice. Minor, 546 S.W.3d at 67. The evidence of the Defendant's guilt was overwhelming. The Defendant and the co-defendant, who were both armed, ambushed Mr. Shivers and Jonathan as they entered their home. The Defendant demanded money from Mr. Shivers while the co-defendant attempted to subdue Mr. Owens and Ms. Shivers. When Mr. Shivers attempted to fight off the intruders, the Defendant shot him three times, including once in the back with the gun pressed "against the skin when the bullet was . . . fired." The Defendant also shot Ms. Shivers and Mr. Owens, ultimately killing Mr. Owens. The Defendant then demanded that Jonathan retrieve money from the bedroom. Jonathan gave the money to the Defendant, and the men fled. At some point, Jonathan was able to see the Defendant's face and was able to identify him as the shooter.

The Defendant went with the co-defendant to Regional One Health in Memphis where a bullet was removed from the co-defendant's leg. The Defendant then arranged for a .40 caliber Smith & Wesson to be sold to Mr. Gray. That gun was eventually recovered by investigators. Forensic testing by the TBI revealed that all of the bullets and cartridge casings recovered from the victims, their home, and the co-defendant had been fired from that .40 caliber Smith & Wesson. Additionally, there was a video on the Defendant's cell phone of him firing that .40 caliber Smith & Wesson approximately one month before the murders. Given this overwhelming evidence of the Defendant's guilt, we conclude that he has failed to demonstrate plain error with respect to the sufficiency of the convicting evidence.

## II. Seizure of the Defendant's Cell Phone

The Defendant contends that the trial court erred in denying his suppression motion, alleging that the seizure of his cell phone was illegal. The Defendant does not challenge the search of the data contained on his cell phone. Rather, the Defendant argues that the initial seizure of his cell phone during his arrest was unlawful and that the arresting officers "should have sought and obtained a search warrant prior to physically seizing [the Defendant's] cellular telephone." The State responds that the Defendant's cell phone was lawfully seized incident to his arrest.

Prior to trial, the Defendant filed a suppression motion making the same argument he now raises on appeal. The trial court held an evidentiary hearing on the Defendant's suppression motion. JPD Sergeant Chris Chestnut testified that an arrest warrant was issued for the Defendant on January 17, 2014. The Defendant was arrested on January 18, 2014, in Ripley by a Deputy United States Marshal and Ripley Police Department officers. Sergeant Chestnut testified that the Defendant's cell phone was seized during his arrest, but that the contents of the phone were not searched until after he obtained a search warrant on January 20, 2014.

The Defendant testified that the home belonged to "a friend of a friend" and that his cell phone was in the home when he was arrested. Ripley Police Department Officer Vincent Tyus testified that he assisted in the Defendant's arrest. Officer Tyus testified that the owner of the home consented to a search of the home. Officer Tyus further testified that the Defendant along with "a duffle bag and a cellular telephone" was found during the search of the home. Those items were seized and transferred to the JPD along with the Defendant. Deputy Brown testified that the Defendant's cell phone was found "during" the search of the home and that he seized the phone when the Defendant was arrested.[4]

The trial court accredited the testimony of Officer Tyus and Deputy Brown. The trial court concluded that they had valid consent by the homeowner to search the home. The trial court also found that the Defendant, as a guest, did not have a reasonable expectation of privacy in the home of "a friend of a friend." The trial court further concluded that the cell phone "was on or near" the Defendant at the time of the arrest and that the arresting officers lawfully seized it incident to his arrest.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law, along with its application of the law to the facts, are reviewed de novo without any presumption of correctness. Id.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches [or seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007).

---

[4] The exact location of the Defendant's cell phone during his arrest was not revealed at either the suppression hearing or the trial.

"A search with the permission of the owner is not an unreasonable search." Deerfield v. State, 420 S.W.2d 649, 651 (Tenn. 1967); see also State v. Tuttle, 914 S.W.2d 926, 931 (Tenn. Crim. App. 1995) (concluding that the trial court properly denied the defendant's suppression motion when the officers had an arrest warrant for the defendant, the owner of the property where the automobile was parked had consented to a search of the property, and the "lawful owner" of the automobile had consented to a search of it despite the fact that it "had supposedly been loaned to" the defendant). The evidence does not preponderate against the trial court's finding that the arresting officers had the homeowner's consent to search the home. As such, the seizure of the Defendant's cell phone during the search was lawful.

Furthermore, while "a warrant is generally required before" a search of the data on a cell phone, officers can seize and secure a cell phone incident to arrest "to prevent destruction of evidence while seeking a warrant." Riley v. California, 134 S. Ct. 2473, 2486, 2493 (2014). This is exactly what the investigators did here. The Defendant's cell phone was seized by Deputy Brown and the Ripley Police Department officers during the Defendant's arrest. It was transferred to JPD Sergeant Chestnut along with the Defendant. Sergeant Chestnut then sought a search warrant for the contents of the cell phone. It was not searched until the warrant was issued on January 20, 2014. As such, we also conclude that the Defendant's cell phone was lawfully seized incident to his arrest.

Moreover, "law enforcement authority in cases of incarceration extends to performing a detailed 'inventory search' of all personal effects in the arrestee's possession." State v. Morris, 469 S.W.3d 577, 583 (Tenn. Crim. App. 2014) (internal quotation marks omitted) (quoting State v. Crutcher, 989 S.W.2d 295, 301 (Tenn. 1999)). The purpose of such inventory searches "is to (1) protect the owner's property, and (2) protect the officers from negligence and civil rights claims in the event the item disappears or is damaged." State v. Ensley, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996). The trial court concluded that the Defendant's cell phone "was on or near" the Defendant at the time of his arrest and was thus subject to seizure for inventory purposes. Accordingly, we conclude that the trial court did not err in denying the Defendant's suppression motion.

### III. Cell Phone Video

The Defendant contends that the trial court erred in admitting the video taken from his cell phone of his firing the murder weapon on Betty Manley Road approximately one month before the murders. The Defendant argues that "the evidence depicted in the video was not relevant to the allegations . . . in the case." The Defendant also argues that the probative value of the video was substantially outweighed by the danger of unfair

prejudice. The State responds that the trial court did not abuse its discretion in admitting the video because it was relevant, highly probative, and not unduly prejudicial.

After the investigators obtained a search warrant for the Defendant's cell phone they were able to download the video of the Defendant's firing the murder weapon at a location on Betty Manley Road. Defense counsel objected to the admission of the video at trial. Defense counsel argued that the State could introduce testimony that the investigators found a video of the Defendant's shooting the murder weapon on the Defendant's cell phone, "[b]ut the video itself [was] unduly prejudicial."

The trial court asked defense counsel what parts of the video were unduly prejudicial, and defense counsel responded that it was "[t]he language." Defense counsel clarified that his objection was "a [Rule] 403 issue" and not a Rule "609 issue" relating to evidence of other crimes.[5] The trial court concluded that the fact that the video showed the Defendant in possession of the murder weapon approximately one month before the murders made the video relevant and highly probative. The trial court ruled that the probative value of the video was not substantially outweighed by the danger of unfair prejudice. However, the trial court ordered that the video be played without its audio in order to address defense counsel's issue with "[t]he language" in the video.

Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. The admissibility of evidence pursuant to these rules "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997)).

Here, the video showed the Defendant's firing the murder weapon approximately one month before the murders. We agree with the trial court that the video was relevant and highly probative regarding the Defendant's identity as the perpetrator of the offenses. We also agree with the trial court that the probative value of the video was not substantially outweighed by the danger of unfair prejudice. In fact, the trial court addressed the only portion of the video that defense counsel stated was unduly prejudicial, "[t]he language," by ordering that the video be played without its audio.

---

[5] In his brief, the Defendant alleges that the video should have been excluded pursuant to Rule "609(3) of the Tennessee Rules of Evidence." However, "[a] party may not raise an issue for the first time on appeal." State v. Turner, 919 S.W.2d 346, 356 (Tenn. Crim. App. 1995).

Accordingly, we conclude that the trial court did not abuse its discretion in admitting the video recovered from the Defendant's cell phone.

## IV. Excited Utterance

The Defendant contends that the trial court erred in admitting the co-defendant's statement, "Cuz, you shot me," under the excited utterance exception to the hearsay rule. The Defendant argues that "no evidence was presented by the prosecution that [the co-defendant] was under the stress of excitement of any event." However, the Defendant's brief cites no legal authority to support this argument. Instead, the Defendant merely references that the statement was admitted as "an excited utterance pursuant [to Tennessee] Rule [of Evidence] 803(2)" and implies that the statement violated "his right to confront and cross[-]examine witnesses guaranteed under the Constitutions of Tennessee and [the] United States." As such, the Defendant has waived plenary appellate review of this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by . . . citation to authorities . . . will be treated as waived in this court").

Plain error review of this issue is not warranted because the Defendant has failed to establish that a clear and unequivocal rule of law was breached. Minor, 546 S.W.3d at 67. Hearsay, an out-of-court statement offered "to prove the truth of the matter asserted," is generally not admissible as evidence. Tenn. R. Evid. 801, 802. However, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is an exception to the rule against hearsay. Tenn. R. Evid. 803(2). Here, the co-defendant's statement was made immediately after he was shot by the Defendant and related to that event.

The co-defendant's statement was a quintessential example of an excited utterance. See State v. Banks, 271 S.W.3d 90, 115-18 (Tenn. 2008) (concluding that a shooting victim's statements about the shooting made several hours later qualified as an excited utterance); Williams v. State, 542 S.W.2d 827, 832 (Tenn. Crim. App. 1976) (concluding that a shooting victim's statement that the defendant shot him "made spontaneously and contemporaneously with the event" qualified as an excited utterance). Additionally, the statement did not violate the Defendant's rights under the Confrontation Clause as it was nontestimonial. See State v. Franklin, 308 S.W.3d 799, 817 (Tenn. 2010) (defining a statement as nontestimonial "if the primary purpose is something other than establishing or proving past events potentially relevant to prosecution, such as providing or enabling assistance to resolve an ongoing emergency"). As such, we conclude that this issue is without merit.

# V. Personal Knowledge

The Defendant contends that the trial court erred in allowing Dr. Huang to identify the bullet removed from the co-defendant's leg because he lacked personal knowledge of the item. The Defendant argues that Dr. Huang had no "personal recollection" of removing the bullet and that "his testimony was based solely upon his review of written records." The State responds that the trial court did not abuse its discretion in allowing Dr. Huang to testify regarding the bullet.

Dr. Huang testified that he did not personally recall removing the bullet from the co-defendant as he had performed "upwards of 200" surgeries since January 2014. However, Dr. Huang noted that the co-defendant's medical records stated that he performed the surgery. Dr. Huang also identified a procedure note in his handwriting from the co-defendant's medical records, which stated, "Patient requests removal of bullet. Will remove and discharge." Dr. Huang noted that he had signed this procedure note as well as the co-defendant's consent form for the procedure.

Dr. Huang additionally testified that Regional One Health's standard procedure when removing a bullet was to "put the bullet into . . . a container and it's sealed and handed over to the police." Dr. Huang further testified that he "always" placed an identifying label on the container with the patient's information. At that point, defense counsel objected to Dr. Huang's identifying the bullet removed from the co-defendant because Dr. Huang's testimony was "based on his review of the records" and not his personal recollection.

The trial court overruled defense counsel's objection, and Dr. Huang identified a specimen container that was labeled with the information the co-defendant provided Regional One Health and that contained the bullet. Defense counsel objected a second time, arguing that Dr. Huang's testimony did not establish a chain of custody because he did not have "any independent recollection of performing [the] surgery."[6] The trial court again overruled defense counsel's objection, and the bullet was entered into evidence.

The determination of whether a witness is competent to testify "is a matter for the trial court's discretion, and the trial court's decision will not be overturned absent abuse of that discretion." State v. Nash, 294 S.W.3d 541, 548 (Tenn. 2009). Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The "[e]vidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Tenn. R. Evid. 602.

---

[6] The Defendant did not include the chain of custody objection in his appellate brief; therefore, he has waived our review of that issue.

A witness need not have "a perfect memory" of a matter in order to satisfy the personal knowledge requirement of Rule 602. State v. Justus Onyiego, No. W2017-00217-CCA-R3-CD, 2018 WL 2175819, at *7 (Tenn. Crim. App. May 10, 2018). Nor does the fact that a witness's memory "may have needed some prompting" mean that they lack personal knowledge. Tenn. Rand, Inc. v. Automation Indus. Grp., LLC, No. E2009-00116-COA-R3-CV, 2010 WL 3852317, at *23 (Tenn. Ct. App. Sept. 29, 2010).

Dr. Huang was unable to provide evidence of his personal knowledge through his own testimony. However, other evidence of Dr. Huang's personal knowledge was introduced through the co-defendant's medical records. The medical records included a note written in Dr. Huang's own handwriting that the co-defendant had requested removal of the bullet and that Dr. Huang would perform the procedure. Additionally, Dr. Huang testified that it was Regional Health One's standard procedure when removing a bullet to place it in a specimen container and turn the container over to the police. Dr. Huang testified that he "always" labeled such containers with the patient's information. Accordingly, we conclude that the trial court did not abuse its discretion in allowing Dr. Huang to identify the bullet he removed from the co-defendant's leg.

## VI. Cell-Site Network Expert Witness

The Defendant contends that the trial court erred in allowing an employee of his cell phone provider to testify as an expert witness on the operation of the provider's cellular network.[7] The Defendant argues that Timothy Campbell, a senior "radio frequency engineer" with AT&T, was not qualified to testify as an expert on the operation of AT&T's cellular network because "he had never . . . authored any publications in this field, had never testified at a trial[, and never] had . . . been declared as an expert witness in a court of law." The State responds that the trial court did not abuse its discretion in allowing Mr. Campbell to testify as an expert witness on this topic.

Mr. Campbell testified at trial as AT&T's custodian of records and produced the Defendant's cell phone records. The State also sought to have Mr. Campbell qualified as

---

[7] This issue and the next issue arise from the State's use at trial of cell-site location information provided by the Defendant's cell phone provider. While this case was pending in this court, the United States Supreme Court issued its opinion in Carpenter v. United States, --- S.Ct. ---, 2018 WL 3073916, at *13 (2018), holding that police "must generally obtain a warrant supported by probable cause before acquiring such records." However, the Defendant did not challenge the constitutionality of the State's having acquired his cell-site location information in the trial court. Moreover, the erroneous admission of evidence seized in violation of the Fourth Amendment is subject to harmless error analysis. See State v. Valentine, 911 S.W.2d 328, 333-34 (Tenn. 1995). The use of the Defendant's cell-site location information was harmless beyond a reasonable doubt in light of Jonathan's testimony identifying the Defendant as the perpetrator, the evidence connecting the Defendant to the murder weapon, and the otherwise overwhelming evidence of the Defendant's guilt.

an expert on the operation of AT&T's cellular network. Mr. Campbell testified that he had worked at AT&T for twenty-one years and was currently a senior "radio frequency engineer." Prior to his current position, Mr. Campbell spent ten years "as a field tech engineer working on electronic devices." Mr. Campbell testified that he had "a two-year electronics degree." Mr. Campbell also testified that he was required to perform forty hours of "continuing education" each year to keep his position.

Mr. Campbell testified that he "optimizes the cellular network" to make sure that "the phones talk to the network . . . in a proper way." Mr. Campbell further testified that his job required "knowledge of how the [cellular] network work[ed]." Mr. Campbell admitted that he had never previously testified in a trial and that he had never "been published in this field." The trial court declared Mr. Campbell an expert "relating to radio access networks" over the Defendant's objection. Mr. Campbell explained to the jury how AT&T's cellular network operated and how cell-site location information was recorded in customer records.

"Trial courts act as gatekeepers when it comes to the admissibility of expert testimony." State v. Scott, 275 S.W.3d 395, 401 (Tenn. 2009). This court "will not reverse a decision regarding the admission or exclusion of expert testimony unless the trial court has abused its discretion." Id. at 404. An abuse of discretion occurs when the trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Id.

Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." To qualify as an expert, a witness "must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002).

A witness "may acquire the necessary expertise through formal education or life experiences." Reid, 91 S.W.3d at 302. "There is generally no established college degree or professional certification that provides the threshold for qualification as an expert," nor does the witness need to "be published." Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] at 7-27 (6th ed.). Here, Mr. Campbell's job as a senior "radio frequency engineer" with AT&T required "knowledge of how the [cellular] network work[ed]." This work experience gave Mr. Campbell expertise in the operation of AT&T's cellular network beyond the scope of common knowledge and experience of the average person. Accordingly, we conclude that the trial court did not abuse its discretion

-14-

in allowing Mr. Campbell to testify as an expert witness on the operation of AT&T's cellular network.

## VII. Lay Witness Testimony Regard Cell-Site Locations

The Defendant contends that the trial court erred in allowing a police investigator to testify as a lay witness about "the plotting and pinging of the Defendant's cellular telephone records." However, the Defendant's argument regarding this issue was limited to the following sentence, "[T]his technical and extremely specialized evidence required expert, not lay, testimony and therefore should have been subject to Rules 702, 703[,] and 704 of the Tennessee Rules of Evidence." As such, the Defendant has waived plenary appellate review of this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument[ or] citation to authorities . . . will be treated as waived in this court").

Plain error review of this issue is not warranted because the Defendant has failed to establish that a clear and unequivocal rule of law was breached. Minor, 546 S.W.3d at 67. At trial, JPD Investigator Robert Graves testified that he reviewed the Defendant's cell phone records and plotted the locations of the cell-sites based upon the longitudes and latitudes of the cell-sites provided in the records. This court has previously concluded that "a layperson could plot the locations" on a map of cell-sites listed in a defendant's cell phone records and draw the inference that the defendant "traveled near these" cell-sites. State v. Dominique Greer, No. E2015-00922-CCA-R3-CD, 2017 WL 2233647, at *16 (Tenn. Crim. App. May 17, 2017) (internal quotation marks omitted) (quoting State v. Clarence D. Hayes, No. M2008-02689-CCA-R3-CD, 2010 WL 5344882, at *10 (Tenn. Crim. App. Dec. 23, 2010)). Such testimony does "not require specialized knowledge as contemplated by" Rule 702, and a trial court does "not err by allowing the testimony." Id. (internal quotation marks omitted) (quoting Hayes, 2010 WL 5344882, at *10). Accordingly, we conclude that this issue is without merit.

## VIII. Consecutive Sentencing

The Defendant contends that the trial court abused its discretion by imposing partial consecutive sentences. The Defendant alleges that the trial court failed "to explicitly recite . . . its reasons for imposing" partial consecutive sentences. The Defendant argues that "the sentence imposed by the trial court was excessive under the circumstances." The State responds that the trial court did not abuse its discretion in imposing partial consecutive sentences.

A sentencing hearing was held following the Defendant's convictions.[8]   Ms. Shivers testified that her family had been "ripped into shreds" by the Defendant's actions. Ms. Shivers also testified that she had trouble sleeping and was afraid to go out in public. The Defendant's mother, Carolyn Wade, testified that the Defendant was "a caring person" who had "been through so much." Ms. Wade also testified that the Defendant continued to maintain that he was innocent and that she believed him. The Defendant was nineteen at the time of the offenses.

It was established at the sentencing hearing that the Defendant was first adjudicated delinquent at the age of nine years old for criminal trespass. He was subsequently adjudicated delinquent for theft of property valued under $500, evading arrest with an automobile, three aggravated burglaries, vandalism of property valued over $1,000, and two instances of theft of property valued over $1,000. While a juvenile, the Defendant violated the terms of his supervision on two occasions. The Defendant also violated curfew on one occasion. Additionally, the Defendant had "a pending case against him for conspiracy to kill Jonathan Shivers."

The trial court imposed a sentence of twenty years for each of the especially aggravated robbery convictions and the attempted first degree murder conviction in addition to the life sentences for the first degree murder convictions. Regarding consecutive sentencing, the trial court found that the Defendant was an offender whose record of criminal activity was extensive based on "his juvenile offenses." The trial court noted that the Defendant had been "committing crimes in Madison County" since he was nine years old and that "if the number of crimes . . . [he had] committed as a juvenile had been as an adult, . . . you could declare him a professional criminal at [this] point."

The trial court also found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and had no hesitation about committing a crime in which the risk to human life was high. In making this determination, the trial court concluded that the circumstances surrounding the offenses were "as aggravated and extreme as it can get." The trial court also concluded that "confinement for an extended period of time [was] necessary to protect society from [the Defendant's] unwillingness to lead a productive life and [his] resort[ing] to criminal activity in furtherance of an [antisocial] lifestyle." The trial court further concluded "the aggregate length of the sentences" was "reasonably related to the severity of the offense[s]" the Defendant had been convicted of.

---

[8] It appears from the record that the State sought to have the Defendant sentenced to life without the possibility of parole for the murder convictions, but the jury rejected this. Instead, the Defendant was sentenced to life. However, this portion of the trial was not included in the appellate record.

The trial court ordered the life sentences for the Defendant's convictions of first degree premeditated murder for the killing of Mr. Shivers and first degree felony murder for the killing of Mr. Owens to be served concurrently. The trial court further ordered that the sentences for one of the especially aggravated robbery convictions and the attempted first degree murder conviction be served consecutively to each other and to the Defendant's life sentence. The sentence for the remaining especially aggravated robbery conviction was ordered to be served concurrently, for a total effective sentence of life imprisonment plus forty years.

At the outset, we note that the record belies the Defendant's assertion that the trial court failed "to explicitly recite . . . its reasons for imposing" partial consecutive sentences. When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was an offender whose record of criminal activity was extensive and that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(2), (4). This court has previously held that "a juvenile record of criminal conduct may properly be considered in assessing a suitable sentence after a felony conviction by an adult." State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). The Defendant was nineteen at the time of the offenses and had an extensive record of juvenile criminal conduct having been adjudicated delinquent nine times, including three times for aggravated burglary. The Defendant also violated the terms of supervised release or curfew on three occasions while he was a juvenile. This was sufficient evidence for the trial court to find that the Defendant had an extensive record of criminal activity.[9]

The Defendant argues that the total effective sentence of life imprisonment plus forty years "was excessive under the circumstances." However, the total effective length of a defendant's sentences will not be found to be excessive simply because it would extend beyond the expected lifetime of the defendant. State v. Robinson, 930 S.W.2d 78, 85 (Tenn. Crim. App. 1995). Here, the Defendant shot Ms. Shivers and murdered Mr.

---

[9] Because only one of the grounds listed in section 40-35-115(b) is needed to justify consecutive sentencing, we need not determine whether the trial court properly concluded that the Defendant was a dangerous offender.

-17-

Shivers and Mr. Owens in their home during the course of a robbery. As Ms. Shivers testified, the Defendant in approximately five minutes "ripped [her family] into shreds." We do not believe that the Defendant's total effective sentence was excessive under the circumstances of this case. Accordingly, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE